UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

   - v. -

POLAD OMAROV et al.,

       Defendant.

S8 22 Cr. 438 (CM)

## PRETRIAL MOTION TO SUPPRESS POST-ARREST STATEMENTS

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT........................................................................................1

II. PROCEDURAL BACKGROUND.................................................................................1

    B. Mr. Omarov is Interrogated During the Extradition Flight............................................4

IV. APPLICABLE LAW...................................................................................................8

V. ARGUMENT.............................................................................................................11

    A. Mr. Omarov Was in Custody and Subject to Express Questioning...................................11

    B. The Special Agents Did Not Verbally Administer Miranda Warnings to Mr. Omarov...... 12

    C. The Agents Did Not Ascertain Mr. Omarov's Ability to Read and Understand Russian and Cannot Rely on the Signed Advice of Rights Form................................................................ 13

    D. Mr. Omarov Unequivocally and Unambiguously Invoked His Right to Counsel.............. 15

VI. CONCLUSION.........................................................................................................16

PAGE

CASES


U.S. SUPREME COURT

*Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010) ……...……………………………...10, 11

*Davis v. United States*, 512 U.S. 452 (1994) …………………………………………………15

*Duckworth v. Eagan*, 492 U.S. 195 (1989) .....................................................................................9

*Edwards v. Arizona*, 451 U.S. 477 (1981) …………………………………..……………15-16

*McNeil v. Wisconsin*, 501 U.S. 171 (1991) …………………………………………………...15

*Michigan v. Harvey*, 494 U.S. 344 (1990) …………………………………………………15

*Miranda v. Arizona*, 384 U.S. 436 (1966) …………………………………...………....*passim*

*Moran v. Burbine*, 475 U.S. 412 (1986) …………………………………………......…10

*Rhode Island v. Innis*, 446 U.S. 291 (1980) …………………………………………………10

*Smith v. Illinois*, 469 U.S. 91 (1984) ………………………………………………………15


CIRCUIT COURTS

*Diaz v. Senkowski*, 76 F.3d 61 (2d Cir. 1996) …………………………………...……15

*United States v. Anderson*, 929 F.2d 96 (2d Cir. 1991) …………………………………….....9

*United States v. Faux*, 828 F.3d 130 (2d Cir. 2016) …………………………………………...10

*United States v. FNU LNU*, 653 F.3d 144  (2d Cir. 2011) …………………………………10

*United States v. Haak*, 884 F.3d 400 (2d Cir. 2018) …………………………………………11

*United States v. Heredia-Fernandez*, 756 F. 2d 1412 (9th Cir. 1985) …………………….....12

*United States v. Male Juv.*, 121 F.3d 34  (2d Cir. 1997) ……………………………………...11

*United States v. Masterson*, 383 F.2d 610 (2d Cir. 1967) ……………………………......9

*United States v. Mendonca*, 88 F.4th 144 (2d Cir. 2023) ………………………………...11

*United States v. Plugh*, 648 F.3d 118 (2d Cir. 2011) ………………………………...10, 11, 13-15

*United States v. Taylor*, 745 F.3d 15 (2d Cir. 2014) …………………………………...10, 11, 14

## DISTRICT COURTS

*United States v. Juv. Male*, 968 F. Supp. 2d 490

    (E.D.N.Y. 2013) …………………………………………………...………………13

*United States v. McKen*, No. 23-CR-377 (JMA) (SIL), 2024 U.S. Dist. LEXIS 193747

    (E.D.N.Y. Oct. 24, 2024) ………………………………………………...………………14

*United States v. Montanez*, No. 23-CR-186, 2024 WL 3360534

    (E.D.N.Y. July 10, 2024) …………………………………………………………...14

*United States v. Soto*, No. 13-CR-76 (MKB), 2014 U.S. Dist. LEXIS 101665

    (E.D.N.Y. July 24, 2014)……………………………………………………………13

## STATUTES

18 U.S.C. § 922(k) ………………………………………………………………………1, 2

18 U.S.C. § 924(c)(1)(A)(i) ……………………………………………………………………2

18 U.S.C. § 1956(h) ……………………………………………………………………………2

18 U.S.C. § 1958 ………………………………………………………………………………2

18 U.S.C. § 1959(b)(2) ………………………………………………………...……………2

U.S. CONSTITUTION

FIFTH AMENDMENT…………………………………………………………………………1, 8-9

## I.    PRELIMINARY STATEMENT

On February 21, 2024, Polad Omarov was extradited from Prague, Czech Republic to New York, New York by U.S. law enforcement agents via a private airplane. While the airplane was airborne, Mr. Omarov was subjected to a custodial interrogation by Federal Bureau of Investigations (hereinafter "FBI") Special Agents (hereinafter "SA") Andro Mossad, Christopher Keiper, and Daniel Mardakhayev. Because Mr. Omarov was unable to speak English, SA Mardakhayev provided Russian language support for the duration of the interview, which lasted approximately four hours and thirty minutes.

Mr. Omarov was never fully advised of his *Miranda* rights, and therefore did not knowingly waive his rights thereunder. Moreover, despite Mr. Omarov unequivocally and unambiguously invoking his Fifth Amendment privilege against self-incrimination by requesting a lawyer twice within the first five minutes of the recorded interview, the SAs refused to honor the request and continued to interrogate Mr. Omarov for approximately the next four and a half hours. This motion seeks the suppression of all statements made by Mr. Omarov while he was in the custody of the FBI that were elicited by (1) express questioning, or (2) conduct that was reasonably likely to elicit an incriminating response.

## II.    PROCEDURAL BACKGROUND

On July 29, 2022, a sealed complaint was sworn out by SA Derek Kasse before the Hon. Sarah L. Cave, United States Magistrate Judge for the Southern District of New York, charging Khalid Mehdiyev (hereinafter "Mehdiyev") with one count of Possessing a Firearm with an Obliterated Serial Number in violation of 18 U.S.C. § 922(k). (ECF No. 1). On August 11, 2022, a grand jury sitting in the Southern District of New York returned an indictment charging

Mehdiyev with one count of Possessing a Firearm with an Obliterated Serial Number in violation of 18 U.S.C. § 922(k). (ECF No. 5).

On January 27, 2023, a fourth superseding indictment (S4) was unsealed, charging Mr. Omarov, and others, with Murder-for-Hire in violation of 18 U.S.C. § 1958 (Count 1), Conspiracy to Commit Murder-for-Hire in violation of 18 U.S.C. § 1958 (Count 2), Money Laundering Conspiracy in violation of 18 U.S.C. § 1956(h) and (f) (Count 3). On September 5, 2024, a seventh superseding indictment (S7) was filed, charging Mr. Omarov with the additional crimes of Attempted Murder in Aid of Racketeering in violation of 18 U.S.C. § 1959(b)(2) (Count 4), and Possession of a Firearm During and in Relation to Attempted Murder in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 5). On October 17, 2024, the operative indictment (S8) was filed, with no additional charges filed against Mr. Omarov.

### III. FACTUAL BACKGROUND

#### A. The Alleged Murder-for-Hire Plot

As alleged in the S8 indictment,[1] Mr. Omarov, Rafat Amirov (hereinafter "Amirov"), and Zialat Mamedov (hereinafter "Mamedov") were members of an Eastern European criminal organization (hereinafter the "Organization") which engaged in crimes, including: theft, extortion, assault, kidnapping and murder. S8 Indictment, ¶4. The indictment alleges that in July 2022, at the behest of the Government of Iran, Amirov – a leader of the Organization residing in Iran, contacted Mr. Omarov to coordinate a murder-for-hire of an Iranian journalist residing in New York City who was a "prolific journalist, author, human rights activist, and prominent critic of the Iranian regime." ¶1, 20(h).

---

[1]     All citations in this section reference the allegations of the S8 indictment.

The indictment further alleges that on July 13, 2022, Mr. Omarov sent Mehdiyev – a native of Azerbaijan residing in Yonkers, New York – photographs of the Journalist, her address, and images of her residence that Mr. Omarov had received from Amirov. ¶20(j). Some time later, Mehdiyev traveled from Yonkers to Brooklyn to conduct surveillance on the Journalist, with images and videos of the surveillance being transmitted to Mr. Omarov, who in turn forwarded them to Amirov. *Id*. Between July 15 and 18, 2022, Mr. Omarov and Amirov arranged a delivery of $30,000 in cash to Mehdiyev, with Mehdiyev ultimately collecting the cash from an individual in Brooklyn. ¶20(k), (l). On or about July 18 and July 19, 2022, Mehdiyev wired a sum of $10,000 to Mr. Omarov's romantic partner in Eastern Europe. ¶20(n).

The indictment further alleges that on or about July 19, 2022, Mehdiyev acquired an AK-47-style assault rifle with an obliterated serial number. ¶20(p). Between July 20 and July 28, 2022, Mehdiyev repeatedly travelled between his Yonkers residence and Brooklyn to surveil the Journalist at her residence, frequently sending photographs and videos of his efforts to Mr. Omarov, who subsequently forwarded them to Amirov. ¶20(r)-(aa). On July 28, 2022, Mehdiyev returned to the Journalist's residence and sent Mr. Omarov a video recording taken inside the car Mehdiyev was driving. The video depicted a suitcase in the backseat of Mehdiyev's car which contained the AK-47 style assault rifle that Mehdiyev had acquired on July 19, 2022. ¶20(aa).

The indictment further alleges that on July 28, 2022, Mehdiyev was pulled over by members of the New York City Police Department (hereinafter "NYPD") after he failed to stop at a stop sign while driving in close proximity to the Journalist's residence in Brooklyn. ¶23. The officers determined that Mehdiyev's driver's license was suspended, and he was subsequently placed under arrest. *Id*. During an inventory search of the vehicle that had been driven by Mehdiyev, officers discovered a suitcase in the rear passenger compartment of the vehicle which

contained a loaded Norinco brand AK-47-style assault rifle with an obliterated serial number and approximately 66 rounds of ammunition. *Id*. After Mehdiyev's arrest, while he was detained pending trial at the Metropolitan Detention Center Brooklyn, he used a contraband cellphone to communicate with Mr. Omarov and Mamedov. ¶20(dd). Finally, it is alleged that in the days following Mehdiyev's arrest, Mr. Omarov exchanged messages with Amirov and Mamedov discussing Mehdiyev's arrest. *See* ¶¶20(ff)-(gg), (kk). Mr. Omarov and Mamedov were arrested by authorities in the Czech Republic on or about January 4, 2023. ¶20(qq).

B. <u>Mr. Omarov is Interrogated During the Extradition Flight</u>

According to an affidavit signed by Mr. Omarov (annexed hereto as <u>Defense Exhibit A</u>), in the morning hours of February 22, 2024, Mr. Omarov was awakened by guards at Ruzyně Prison in Prague, Czech Republic, where Mr. Omarov had been held in solitary confinement since approximately January 2023. <u>Ex.</u> <u>A</u>, ¶2, 5. Mr. Omarov was whisked out of his cell, without any advance notice, and a blindfold was placed over his eyes, and earmuffs placed over his ears, leaving him unable to see or hear anything. *Id*., ¶6. Despite not being able to see or hear, Mr. Omarov was able to glean that he had been placed inside a vehicle because he could feel movement consistent with travelling in a motorized vehicle. *Id*. When his blindfold and earmuffs were removed, Mr. Omarov found himself alone in a room, which he later came to learn was located in an airport. *Id*., ¶8.

After spending approximately one and half hours alone in this room, FBI Special Agent Daniel Mardakhayev[2] (hereinafter "SA Mardakhayev"), and two members of the United States

---

[2]     Mr. Omarov was unaware that this individual was an FBI agent at the time. In fact, he was unaware of this fact until reviewing the discovery with counsel in January 2025. <u>Ex.</u> <u>A</u>,   11.

Armed Forces (hereinafter the "Military Members"), both of whom were armed with pistols, entered the room. Whereupon SA Mardakhayev explained, in Russian, that the Military Members were going to be conducting strip search and a battery of medical tests on Mr. Omarov. *Id*., ¶8, 9 After the strip search and medical tests, Mr. Omarov was again blindfolded, his ears covered with earmuffs, and was restrained with handcuffs and shackles. *Id*., ¶8. When his blindfold and earmuffs were next removed, Mr. Omarov found himself seated on a private airplane, with one Military Member seated immediately to his right, and the other directly facing him, both still armed with pistols. *Id*., ¶12, 14. Some time after takeoff, SA Mardakhayev and two other individuals approached the area where Mr. Omarov and the Military Members were seated and had a conversation in English with Military Members that Mr. Omarov did not understand. *Id*., ¶15. After this brief conversation, the Military Members arose from their seats and the two individuals and SA Mardakhayev sat down in their place. *Id*.

Communicating through SA Mardakhayev, who translated from English-Russian, the two individuals identified themselves as "Andro" and "Chris" and that they were Special Agents with the FBI.[3] The agents inquired into Mr. Omarov's wellbeing, and asked whether he wanted any food and drink, which they then provided. *Id*., ¶16. Around this time, the agents began to audio record the conversation with Mr. Omarov, a true and accurate copy of this recording (USAO_018465) is annexed hereto as <u>Defense Ex. B</u> and a transcript of the conversation is

---

[3]     Based on the review of discovery, these Special Agents are known to the Defense as SA Andro Mossad (hereinafter "Mossad") and SA Christopher Keiper (hereinafter "Keiper").

annexed hereto as <u>Defense Ex. C</u>[4] At the 0:28 time marker, SA Mardakhayev told Mr. Omarov in Russian:

> **Mardakhayev:** [UN] first, we need, uh, for you to sign [UN] *of rights*[5]...in Russian to say, well, here, we have a paper, well, here, you read it, it's about the lawyer…

By the 0:44 time marker, SA Mardakhayev has presented Mr. Omarov with a document written in Russian, and asks Mr. Omarov whether he is able to read Russian, to which Mr. Omarov responds in the affirmative. This Russian document, annexed hereto as <u>Defense Ex. D</u>, is an advice of rights form, and was simply described to Mr. Omarov as "about the lawyer." Beginning at the 1:58 time marker, the following exchange took place between SA Mossad and SA Mardakhayev in English:

> **Mossad:** *So I am going to read it to him, let him know that*.
>
> **Mardakhayev:** *He doesn't, he doesn't understand...let him, let him read a Russian copy and he has a question he will tell us…*

Then, beginning at the 3:20 time marker, the following dialogue takes place:

> **Mardakhayev:** Yes, this just needs to be sign(ed).
>
> **Omarov:** I, look, I can sign…
>
> **Mardakhayev:** Yes, right here...but are there any questions there or not…
>
> **Omarov:** Here we go!
>
> **Mardakhayev:** Yes!
>
> **Mossad:** *Does he understand this?*
>
> **Mardakhayev:** Do you have any questions or...do you have questions about this?

---

[4]     <u>Ex. C</u> was prepared by Sanjar Babadjanov, Russian interpreter assigned to Mr. Omarov's case. <u>Ex. C-1</u> is identical to <u>Ex. C</u>, but it also contains English transcriptions in red font that were originally spoken in English and transcribed by Mr. Omarov's attorneys.

[5]     Italics in the transcript indicate parts spoken in English.

| | |
|---|---|
| **Omarov:** | I have a question about this… |
| **Mardakhayev:** | Aha… |
| **Omarov:** | There is...uh, how to say, there is no question. |
| **Mardakhayev:** | So… |
| **Omarov:** | Well, I can talk to you… |
| **Mardakhayev:** | Yeah…okay. |
| **Omarov:** | But I won't, uh, formally answer all the questions…[b]ecause I can, like, talk to you, eh, we'll have time, I'll give you, any interrogation, **I just really want to see a lawyer, I don't know their law**[6]...like, well, I have nothing to talk about...now let them not think that I'm hiding something or something... I can talk, like I'm talking to you...and the official question- answer, which is an interrogation, I am ready for this interrogation...I have been ready for a long time......**but, I just want to see the lawyer, the attorney**...so, that tomorrow in the process… |
| **Mardakhayev:** | Now, let me explain to them...if you want a lawyer, we can stop it...however you want? |
| **Omarov:** | I can talk…[b]ut it's not like we're going to have the main interrogation now or…[o]r we will [UI]...we can have a light conversation or...? |
| **Mardakhayev:** | Exactly, if you don't like something, tell me…[a]nd I will tell them...okay? |
| **Omarov:** | Yes, which, all the questions, maybe somewhere I can't answer, somewhere I can answer… |
| **Mardakhayev:** | *He has some little reservations about formally answering questions without a lawyer. I think the approach is going to be conversational. If he feels uncomfortable at any point...* |
| **Mossad:** | *We will stop at any point.* |
| **Omarov:** | **Because I don't know the law**, that's why. I have nothing to hide...**Tell them that I want to get acquainted with their laws**...there is nothing more to hide...I can speak. |

---

[6]    Bolding and underlining added for emphasis.

| | |
|---|---|
| **Mardakhayev:** | *He has nothing to hide, but is interested in knowing the laws of America.* |
| **Mossad:** | *Out of curiosity, so we are clear, he doesn't want to talk to us without a lawyer?* |
| **Mardakhayev:** | Do you want to talk to them now without a lawyer? |
| **Omarov:** | I can. |
| **Mardakhayev:** | Yes, he can. |
| **Mossad:** | *He can? Tell him, at any point, when we are talking to him, if he wants to invoke his right to an attorney, he can stop talking.* |
| **Mardakhayev:** | **If, if you...if you want to stop, you can tell them, you don't want to talk anymore, and they stop...** |
| **Omarov:** | What is this? |
| **Mardakhayev:** | This is simply what he explains to you... |
| **Omarov:** | Yes, I'll look at the questions, if I don't like something somewhere, I can stop. |
| **Mardakhayev:** | *Perfect.* |

None of the Special Agents orally advised Mr. Omarov of his *Miranda* rights, either in Russian, English or Azeri, Mr. Omarov's native language. Alarmingly, at time marker 1:58, SA Mardakhayev outright refused SA Mossad's offer to read Mr. Omarov his *Miranda* rights. None of the Special Agents ever asked Mr. Omarov to read the advice of rights form aloud, to ensure that he could read Russian. SA Mardakhayev never asked Mr. Omarov, in Russian or otherwise, whether he understood the advice of rights form – only asking if he had "questions about this" at time marker 3:31. Similarly, at time marker 5:43, SA Madakhayev never translated SA Mossad's statement about Mr. Omarov's right to have counsel present during questioning into Russian for Mr. Omarov to understand.

## IV.   APPLICABLE LAW

The Fifth Amendment guarantees that "no person...shall be compelled in any criminal case to be a witness against himself." In *Miranda v. Arizona*, 384 U.S. 436, 439 (1966), the Supreme Court established a number of "prophylactic rights," including the right to have counsel present during custodial interrogation, so as to "assure that the individual is accorded his privilege under the Fifth Amendment to the Constitution not to be compelled to incriminate himself." A suspect who is subject to custodial interrogation must be forewarned that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Duckworth v. Eagan*, 492 U.S. 195, 202 (1989) (quoting *Miranda*, 384 U.S. at 479). After providing *Miranda* warnings, law enforcement may then proceed to question a suspect who "knowingly and intelligently waive[s] his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda*, 384 U.S. at 475. But there can be no further questioning if a suspect "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking." *Id*. at 444-45.

On a motion to suppress in a criminal case, the defendant bears the burden of demonstrating the basis for the motion. *See United States v. Masterson*, 383 F.2d 610, 614 (2d Cir. 1967). Once the defendant meets his burden, the burden shifts to the government. Where the defendant alleges that he was questioned in violation of *Miranda* and the Fifth Amendment, "[t]he prosecution has the burden of establishing by a preponderance of the evidence that a suspect waived his *Miranda* rights, and that his confession is truly the product of free choice." *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991). "A statement made by the accused

'during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived *Miranda* rights when making the statement.'" *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014) (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010)) (brackets omitted).

An interaction between law enforcement officials and an individual generally triggers *Miranda*'s prophylactic warnings when the interaction becomes a custodial interrogation. *See United States v. FNU LNU*, 653 F.3d 144, 148 (2d Cir. 2011) ("This determination has two parts: (a) there must be an interrogation of the defendant, and (b) it must be while she is in custody.") (internal quotation marks omitted). Interrogation under *Miranda* refers "not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). The test for determining whether a defendant was in custody "is an objective inquiry that asks (1) whether a reasonable person would have thought he was free to leave the police encounter at issue and (2) whether a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016) (internal quotation marks omitted).

The waiver inquiry has two distinct components. First, "the relinquishment of rights was 'knowing,' which is to say that 'the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011) (quoting *Moran v. Burbine*, 475 U.S. 412 (1986)). Second, "it must have been 'voluntary,' which is to say 'that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id*. Where *Miranda*

applies, the Court must "look at the totality of circumstances surrounding a *Miranda* waiver and any subsequent statements to determine knowledge and voluntariness." *United States v. Mendonca*, 88 F.4th 144, 164 (2d Cir. 2023) (quoting *Taylor*, 745 F.3d at 23). Such circumstances "generally fall into three categories: '(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials.'" *Id.* (quoting *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018)). A defendant's waiver of their *Miranda* rights may be express, such as when a suspect signs a "waiver-of-rights" form, or implied by "the actions and words of the person interrogated." *Plugh*, 648 F.3d at 127.

In the case of an implied waiver, "the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Id.* Whether express or implied, where the government claims that the defendant waived his Miranda rights, the government must demonstrate that he understood the rights he waived before he forfeited them. *See Berghuis*, 560 U.S. at 384; *United States v. Male Juv.*, 121 F.3d 34, 40 (2d Cir. 1997) ("Only if the totality of the circumstances reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." (citation omitted)).

## V. ARGUMENT

### A. Mr. Omarov Was in Custody and Subject to Express Questioning

The Defense submits there can be no legitimate dispute to the threshold questions of whether Mr. Omarov was subject to custodial interrogation. At the time of his statements, Mr. Omarov was being extradited to the United States on a private flight under the guard of two

armed members of the United States military and at least three Special Agents with the FBI. He had been brought onto the plane in a blindfold, earmuffs, and restrained in handcuffs and shackles. No reasonable person in such a scenario would have thought he was free to leave the police encounter at issue. Therefore, Mr. Omarov was in custody at the time of the statements in issue. Similarly, Mr. Omarov was subject to express questioning for approximately four and a half hours. The questions posed to him during this time were magnitudes beyond the scope of those that would normally be attendant to arrest and custody. Accordingly, Mr. Omarov was subject to custodial interrogation as contemplated by *Miranda* and its progeny,

B. <u>The Special Agents Did Not Verbally Administer *Miranda* Warnings to Mr. Omarov</u>

Because Mr. Omarov was subject to custodial interrogation, the Special Agents were required to administer the prophylactic warnings as defined in *Miranda*. Despite having a Russian-speaking agent present to communicate with Mr. Omarov, none of the prophylactic warnings were fully or accurately administered. Despite SA Mossad's offer to read Mr. Omarov his rights in English, ostensibly with translation into Russian, such oral warnings never occurred. Perhaps tellingly, when SA Mossad explicitly stated, in English, that if Mr. Omarov wished to invoke his right to an attorney, that he could stop talking, SA Mardakhayev's Russian translation omits any mention of his right to an attorney:

| **Mossad:** | *He can? Tell him, at any point, when we are talking to him, **<u>if he wants to invoke his right to an attorney, he can stop talking.</u>*** |
|---|---|
| **Mardakhayev:** | If, if you...if you want to stop, you can tell them, you don't want to talk anymore, and they stop... |

<u>Ex.</u> B at 5:43; <u>Ex.</u> <u>C-1</u> at 8.

A language barrier is a factor the court should consider when determining the validity of a waiver. *See e.g. United States v. Heredia-Fernandez*, 756 F. 2d 1412, 1415 (9th Cir. 1985) ("One precondition for a voluntary custodial confession is a voluntary waiver of *Miranda* rights, and language difficulties may impair the ability of a person in custody to waive these rights in a free and aware manner"); *United States v. Juv. Male*, 968 F. Supp. 2d 490 (E.D.N.Y. 2013). Where the person in custody has a limited ability to understand a written *Miranda* waiver in the language in which it is written, "[t]he verbal explanation and reading is of special importance." *United States v. Soto*, No. 13-CR-76 (MKB), 2014 U.S. Dist. LEXIS 101665, at *18-19 (E.D.N.Y. July 24, 2014).

Given the language barrier during the course of this interrogation, it was incumbent upon the Special Agents to adequately advise Mr. Omarov of his rights in a language that he could understand. While Mr. Omarov is *conversational* in Russian by virtue of encountering Russian speakers over the years, Azerbaijan's geographic proximity and cultural overlap as a former member of the USSR (*see* Ex. A, ¶28), he has no formal education in the Russian language. SA Mardakhayev's reluctance to orally advise Mr. Omarov of his rights prevented Mr. Omarov from having "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Plugh*, 648 F.3d at 127.

C.  The Agents Did Not Ascertain Mr. Omarov's Ability to Read and Understand Russian and Cannot Rely on the Signed Advice of Rights Form

Given that Mr. Omarov was never orally advised of his rights, it was imperative that he was able to read *and* fully understand the written advice of rights form. Though SA Mardakhayev did ask Mr. Omarov whether he was able to read in Russian, and Mr. Omarov

responded affirmatively, no inquiry was ever made into his level of reading comprehension, or whether he understood his rights after he read them.

Where the government relies on a defendant's signature on an advice of rights form to demonstrate a knowing and voluntary waiver, "the Government must demonstrate that Defendant 'read[ ]' the advice of rights form or the rights 'w[ere] read' to him." *United States v. McKen*, No. 23-CR-377 (JMA) (SIL), 2024 U.S. Dist. LEXIS 193747 (E.D.N.Y. Oct. 24, 2024) (quoting *Taylor*, 745 F.3d at 23); *see Plugh*, 648 F.3d at 127 (concluding that the defendant waived his *Miranda* rights where it was undisputed that he read the advice of rights form he signed); *United States v. Montanez*, No. 23-CR-186, 2024 WL 3360534, at *7-8 (E.D.N.Y. July 10, 2024) (concluding the defendant waived his Miranda rights where officers read those rights to him and he took approximately ninety seconds to review and sign an advice of rights form).

Here, there is no indication that Mr. Omarov read *and* understood the advice of rights form. To the contrary, at time marker 5:19 of <u>Ex. B</u>, less than one minute before formal questioning began, Mr. Omarov vocally raises his concerns about not understanding his rights:

|  |  |
|---|---|
| **Omarov:** | **<u>Because I don't know the law</u>**, that's why. I have nothing to hide...Tell them that **<u>I want to get acquainted with their laws</u>**...there is nothing more to hide...I can speak. |

Then, at time marker 5:59, immediately before questioning began, the following exchange occurred:

|  |  |
|---|---|
| **Omarov:** | [SC] what is this? |
| **Mardakhayev:** | [OV] ... this is simply what he explains to you... |

From the context of this dialogue, it appears as though Mr. Omarov was asking SA Mardakhayev what the Russian document was. In sum, absolutely nothing from the audio recorded interview demonstrates that Mr. Omarov read and understood the advice of rights form that he signed.

D. Mr. Omarov Unequivocally and Unambiguously Invoked His Right to Counsel

To invoke their privilege against self-incrimination, a defendant must unambiguously request counsel. *See Smith v. Illinois*, 469 U.S. 91 (1984). To do so, "he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States*, 512 U.S. 452, 458–59 (1994). Therefore, statements such as "[m]aybe I should talk to a lawyer," *Id.* at 462, "[d]o you think I need a lawyer?" (*Diaz v. Senkowski*, 76 F.3d 61, 63 (2d Cir. 1996)), and "I don't know if I need a lawyer," (*Plugh*, 648 F.3d at 121), do not constitute an unambiguous request for counsel. Where a statement indicates indecision, for example, "I am not sure if I should be talking to you," or contemplation, it is too ambiguous to constitute an invocation of *Miranda* rights. *Id.* at 125.

Furthermore, as the Supreme Court held in *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981), "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." Thus, "[i]f the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards." *McNeil v.*

*Wisconsin*, 501 U.S. 171, 177 (1991). This rule is "designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights," *Michigan v. Harvey*, 494 U.S. 344, 350 (1990).

Despite not being fully or accurately apprised of his rights, Mr. Omarov unambiguously and unequivocally invoked his right to counsel where he said, "I just really want to see a lawyer," (Ex. B at 3:50), and "I just want to see the lawyer, the attorney." *Id*. at 4:22. Despite this, SA Mardakhayev only conveyed to the English-speaking agents that "[Mr. Omarov] has some little reservations about formally answering questions without a lawyer." *Id*. at 5:03. Had SA Mardakhayev accurately translated and communicated what Mr. Omarov was telling him to the English-speaking agents, no reasonable law enforcement officer could have understood those statements to mean anything other than Mr. Omarov was invoking his right to counsel. What's more, after invoking his right to counsel, the agents continued to interrogate Mr. Omarov, but his responses to their questioning did not constitute a waiver because counsel was not provided, nor was there a break in custody. *See Edwards*, 451 U.S. 477.

## VI. CONCLUSION

Wherefore, the Defense respectfully requests that Mr. Omarov's audio recorded statements made to the FBI agents be suppressed in their entirety.

Dated: New York, New York

February 6, 2025

s/ Andrew Patel
Andrew Patel, Esq.
15 Chester Avenue
White Plains, NY 10601
Phone: 212-349-0230
apatel@apatellaw.com

s/ Elena Fast
Elena Fast, Esq.
The Fast Law Firm, P.C.
521 Fifth Ave, 17 Floor
Phone: 212-729-9494
elena@fastlawpc.com

s/ Michael Perkins
Michael Perkins, Esq.
The Fast Law Firm, P.C.
521 Fifth Ave, 17 Floor
Phone: 212-729-9494
michael@fastlawpc.com

*Counsel for Polad Omarov*