**FAST LAW**

Elena Fast, Esq.
Tel (212) 729-9494
elena@fastlawpc.com

February 21, 2025

**Via ECF**
Hon. Colleen McMahon
Senior U.S. District Court Judge
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

Re:    **United States v. Polad Omarov, 22 Cr 438 (CM)**
       *Defendant Omarov's Opposition to Government's Motions in Limine*

Dear Judge McMahon:

Through Counsel, Polad Omarov respectfully submits this opposition to Government's motions *in limine* dated February 7, 2025. Given the Government's motions *in limine*, Mr. Omarov is raising three additional motions *in limine* which were not anticipated at the time of the initial February 7, 2025 filing, *infra* at I and II, and V.

### I.    Mr. Omarov's Trial Should Be Severed From His Co-Defendant's (Defense Motion *in Limine* No. IV)

In Mr. Omarov's first motion *in limine* (ECF No. 101), the Defense submitted that Mr. Omarov could not be tried on Counts Four, Five or Six[1] of the eighth superseding indictment (S8) because those charges violate the Rule of Specialty. On February 13, 2025 the Defense conferred with AUSA Jacob Gutwillig regarding whether Mr. Omarov would consent to being charged with Counts Four and Five of the S8 indictment should the Czech Republic not provide a waiver to the Rule of Specialty prior to the March 10, 2025 trial. In the event that the Czech Republic fails to provide a waiver of the Rule of Speciality prior to trial, and Mr. Omarov refuses to consent to being charged with Counts Four and Five, the Government agrees with the Defense's position that those counts must be severed as to Mr. Omarov.

If Counts Four and Five are severed as to Mr. Omarov, the Defense seeks severance from co-defendant Rafat Amirov (hereinafter "Amirov") pursuant to Federal Rule of Criminal Procedure 14(a) because evidence tending to prove the existence of the RICO Enterprise in Count Four will no longer be admissible against Mr. Omarov, and no remedy short of severance will cure the extremely high risk of unfair prejudice that would result. Additionally, severance is also justified if certain statements allegedly made by Amirov to a cooperating witness while incarcerated at the Metropolitan Detention Center Brooklyn (hereinafter the "MDC") are admitted at Mr. Omarov's trial.

---

[1]    Mr. Omarov is not charged in Count Six.

1

A.  Legal Standard

The indictment may charge two or more defendants if "they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). It is generally appropriate for defendants who are indicted together and "charged with participating in the same criminal conspiracy" to have joint trials. *See United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003). Nevertheless, a district court may "sever the defendants' trials" if a joinder would "prejudice a defendant," Fed. R. Crim. P. 14(a), and the prejudice is "sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple lengthy trials." *United States v. Walker*, 142 F.3d 103, 110 (2d Cir. 1998). A district court should grant a severance "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993).

A sufficiently severe risk of prejudice "might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant." *Id*. One such example of this "spillover" effect is where "evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty." *Id*. Also relevant to the prejudice determination is where there is "[e]vidence that is probative of a defendant's guilt but technically admissible only against a codefendant." *Id*.; *see also United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998) ("Prejudicial spillover occurs in joint trials when proof inadmissible against a defendant becomes a part of his trial solely due to the presence of co-defendants as to whom its admission is proper.") (internal quotation marks omitted). Given that "[t]he risk of prejudice will vary with the facts in each case," there are instances where "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Id*., *see also Richardson v. Marsh*, 481 U.S. 200, 211 (1987) ("The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process").

B.  Much of the Evidence of the RICO Enterprise Would Be Inadmissible Against Mr. Omarov and No Remedy Short of Severance Would Suffice to Cure the Prejudice

Much of the Government's anticipated evidence at trial is probative of the existence of and the pattern of racketeering activity engaged in by the RICO Enterprise, the *Vor v Zakone*, or "Thieves-in-Law":

> "The Government expects to introduce evidence of Omarov's and Amirov's membership in the Russian Mob and crimes they committed with each other and with Mehdiyev and Mamedov as part of their membership in the Russian Mob, including acts of extortion, kidnapping, murder and attempted murder committed

2

> overseas; and acts of racketeering committed in the United States, specifically, extortion plots against business owners in Brooklyn and the extortionate arson and shooting targeting Victim-2. The Government also expects to introduce expert testimony about the Russian Mob and its history, organization, and structure, as well as particular prominent members of the Russian Mob with whom the defendants are associated."

(Gov't Mot. *In Limine*, ECF No. 104 at 40). The Government argues that the "background and context of the Russian Mob[2] generally and racketeering acts committed by members of the [RICO Enterprise]—including Amirov and Omarov—specifically, is…inextricably intertwined with the murder-for-hire counts." *Id.* at 41.

While there is a partial factual overlap between the murder-for-hire plot in Counts One and Two and proof of the RICO Enterprise in Count Four, the quantity and nature of evidence required to establish the relatedness and the continuity necessary to show a RICO pattern dwarfs what would be admissible as "background" on the murder-for-hire charges. It is true that prejudicial spillover justifying severance is "an unlikely occurrence when all the defendants are charged under the same conspiracy count," *Salameh*, 152 F.3d at 115, but here, evidence of the RICO Enterprise, which involves crimes including "extortion, kidnapping, murder and attempted murder" (Gov't Mot. at 40), would be inadmissible against Mr. Omarov because he will not be tried on Count Four. *See United States v. Burke*, 789 F. Supp. 2d 395, 399 (E.D.N.Y. 2011) (granting severance based on risk of spillover from co-defendants who were "charged with participating in comparatively violent criminal acts, including three murders, several robberies and assaults as predicate acts of an alleged RICO conspiracy.").

If the jury were to hear copious amounts of RICO Enterprise evidence that was inadmissible against Mr. Omarov, the risk of prejudicial spillover would be alarmingly high, especially in light of the Government's stated intention of introducing evidence of racketeering acts allegedly committed by Mr. Omarov as Rule 404(b) evidence. *Contra United States v. Hernandez*, 85 F.3d 1023, 1029 (2d Cir. 1996) ("The crimes for which [codefendants] were alone charged were adequately distinct from the crimes of which [the defendant seeking severance] was accused so that the evidence relating to each could be presented without any confusion or spillover effect"). Here, because Mr. Omarov is alleged to be a member of the RICO Enterprise but will not be tried on Count Four, there is a serious risk that the jury will be unable to distinguish the evidence that must be considered *only* against Amirov, from the evidence admissible to against Mr. Omarov on the murder-for-hire counts. Moreover, the prejudicial spillover from the RICO Enterprise evidence being introduced at Mr. Omarov's trial would compromise his right to a fair trial and prevent the jury from making a reliable judgment about guilt or innocence. No limiting instructions issued by the Court, no matter how forceful or abundant, would suffice to cure the unfair prejudice to Mr. Omarov.

---

[2]      Defense seeks preclusion of use of the term "Russian Mob," *infra* at II.

    C.   <u>Admissions Made by Co-Defendant Amirov to a Cooperating Witness Are Inadmissible Hearsay When Offered Against Mr. Omarov and No Limiting Instruction Would Suffice to Cure the Ensuing Prejudice</u>

As discussed in greater detail, *infra* at IV, certain admissions allegedly made by co-defendant Amirov to a cooperating witness (CW-1) while incarcerated at the MDC are inadmissible hearsay when offered against Mr. Omarov. Though admission of these statements does not violate the Confrontation Clause under *Bruton v. United States*, 391 U.S. 123 (1968), these statements are nonetheless extremely prejudicial spillover and should be considered by the Court in granting severance because despite being inadmissible against Mr. Omarov, they "become[] a part of his trial solely due to the presence of co-defendants as to whom its admission is proper." *Salameh*, 152 F.3d at 115.

## II.    The Government Should be Precluded From Referring to the RICO Enterprise as the "Russian Mob" (Defense Motion *in Limine* No. V)

In their motions *in limine*, the Government makes clear that they intend on characterizing the RICO Enterprise as referenced in <u>Count</u> <u>Four</u>, as the "Russian Mob." For the reasons detailed below, the Defense seeks a ruling from the Court pursuant to Federal Rule of Evidence 403 precluding the Government from referring to the alleged RICO Enterprise as the "Russian Mob" because such a characterization would be inaccurate, unfairly prejudicial, and present a danger of misleading the jury.

    A.   <u>Background</u>

The Government alleges that Mr. Omarov, Amirov, Khalid Mehdiyev (hereinafter "Mehdiyev"), and Zialat Mamedov (hereinafter "Mamedov") were "all members of the *Vory v Zakone*, or the Russian Mob." (Gov't Mot. at 9). The Government further alleges that Mr. Omarov, Amirov, Mehdiyev, and Mamedov (collectively the "sub-group") comprise "a sub-group within the Russian Mob based on shared loyalties, common rivals, and joint criminal efforts, and constitute the racketeering enterprise described in [the S8 indictment]." *Id*. at 15. The Government details the structure and history of this sub-group of the "Russian Mob", including how the sub-group "initially became associated through their shared loyalty to Nadir Salifov, a/k/a 'Lotu Guli,' a powerful and notorious *vor*." *Id*. Specifically, the Government claims that "Mehdiyev and Omarov became *bradiyaga* under Salifov; and Amirov was made a *vor* by Salifov." *Id*. Salifov, the individual who the Government alleges was the common thread that bound the sub-group, was a citizen of Azerbaijan who "served approximately 15 years in an Azerbaijani prison," and upon his release, "relocated to Turkey, where he resided until his assassination on August 19, 2020." *Id*. at 15 n. 5.

The Government's expert disclosure for Dr. Louise Shelley, "an expert on … organized crime in the Soviet Union and its successor states," states that she is expected to testify regarding:

> "(i) the structure and hierarchy of subsets of the Russian Mob
> involving ethnic Azeris ("Azeri Organized Crime") and the role

played by *vory v zakony*; (ii) the role of lower-level associates within Azeri Organized Crime; (iii) the culture and tenets of Azeri Organized Crime; (iv) for-hire or contracted services in Azeri Organized Crime; and (v) the relationship between state actors and Azeri Organized Crime."

ECF. No. 98-1 at 2. Moreover, in sworn testimony given in *United States v. Tavberidze*, 23 Cr. 585 (JSR) (S.D.N.Y. December 2, 2024), Dr. Shelley testified that "[her] particular focus is the organized crime of the former Soviet Union." (*Gov't. Shelley Expert Notice*, Ex. B at 48). Also in *Tavberidze*, Dr. Shelley explained the history of the term *vor v zakone*, by testifying that it "originated in the prerevolutionary period…before the Soviet Union," and that "thieves-in-law operate throughout the former Soviet Union," and how "after the collapse of the Soviet Union [the *vor*] had the ability to travel and become much more of a transnational criminal organization." *Id*. at 59. Notably, nowhere in her sworn testimony did Dr. Shelley refer to the *vor v zakone* as Russian in origin, and certainly not as the "Russian Mob."

B. <u>The Sub-Group Has No Nexus to Russia and Referring to it as the "Russian Mob" is Factually Inaccurate and Unfairly Prejudicial</u>

As alleged in the S8 indictment, Mehdiyev "is a citizen of Azerbaijan" (S8 Indictment, ECF No. 80 at 13), while Amirov is described as "a citizen of Azerbaijan and Russia." *Id*. at 11. In a post-arrest interview with the FBI, Mr. Omarov referred to himself as an "Azerbaijani thief," (Gov't Mot. at 31, 48),[3] though his country of citizenship is not stated in the Government's motions *in limine*. However, in the S4 indictment, Mr. Omarov is referred to as a citizen of Georgia, who has resided in "Eastern Europe, including Slovenia and the Czech Republic." (S4 Indictment, ECF No. 22 at ¶6). Tellingly, Mr. Omarov, Amirov, Mamedov and Mehdiyev "communicated primarily in Azeri Turkic." (S8 Indictment at 16 n. 3). At the time of the alleged murder-for-hire plot, Mr. Omarov, Amirov, and Mamedov were "residing in Iran and Europe" and Mehdiyev in New York City. (Gov't Mot. at 9). Also, as discussed *supra*, Nadir Salifov also operated primarily in Azerbaijan and later, Turkey.

Despite the dearth of connections to Russia in comparison to the abundance of connections to Azerbaijan, and their expert witness' expected testimony regarding "Azeri Organized Crime," the Government nevertheless refers to the sub-group as the "Russian Mob" on dozens of occasions in their motions *in limine*. Intentions aside, given the United States' tenuous and contentious diplomatic relations with the Russian government, and the widespread media attention it has received over the past several years, referring to the sub-group as the "Russian Mob" at trial would not only be unfairly prejudicial, it would also be factually inaccurate and potentially mislead the jury. Accordingly, the Government should be precluded from referring to the sub-group as the "Russian Mob," and the Court should require that any alternative name for the sub-group should be adequately supported by articulable facts.

---

[3]     The Defense has filed a motion to suppress statements made by Mr. Omarov in his post-arrest interview, which is currently pending before the Court. (*See* ECF No. 97).

**III.    The Government Should be Precluded from Introducing Evidence of the Government of Iran's Plots to Target Dissidents Other Than Victim-1 (Government Motion *in Limine* No. I)**

The Government seeks to introduce an expansive history of the Government of Iran's (hereinafter "GOI") pattern of silencing political dissidents and enemies other than Victim-1 by means of kidnapping and execution. The Court should exclude this evidence because its marginal probative value is substantially outweighed by a risk of unfair prejudice, confusing the issues, and needlessly presenting cumulative evidence.

A.  <u>Background</u>

The Government anticipates introducing evidence on this point, through both lay and expert witnesses, that falls into three categories: (1) "evidence of the GOI's involvement in the July 2022 murder-for-hire plot" [of Victim 1], (2) "evidence of the GOI's longstanding targeting of Victim-1," and (3) "evidence of the GOI's broader policy history and of targeting dissidents and foreign nationals for intimidation, kidnapping, and murder." (Gov't Mot. at 33). The Defense does not object to the first two categories, but does object to the third. The third category is marginally relevant and is unfairly prejudicial because it relates to the state-sponsored execution of two victims that are entirely unrelated to the instant case.

Under the third category, the Government seeks to introduce evidence of the 2019 abduction, imprisonment, and execution of Iranian national, Ruhollah Zam (hereinafter "Zam"), a resident of France with refugee status. *Id*. at 34. Zam was allegedly lured by the GOI to leave France, whereupon he was captured by Iranian authorities and executed in December 2020.[4] *Id*. Second, the Government seeks to introduce evidence of the GOI's capture, "show trial," and execution of Jamshid Sharmahd (hereinafter "Sharmahd"), a lawful permanent resident of the United States, while he was awaiting a connecting flight in Dubai, United Arab Emirates.[5] *Id*. at 34-35.

The Government argues that "evidence of the GOI's history of targeting dissidents and its *modus operandi* is relevant and helpful for the jury to understand the charged murder-for-hire plot." *Id*. at 39. Specifically, the Government contends that "[a] jury comprised of average New Yorkers may well struggle to accept the plausibility of a foreign government intelligence plot to murder a journalist living in the United States and a foreign government's use of a criminal network to carry out that murder," and thus the evidence would "help to contextualize the

---

[4]    Mr. Zam was "tricked" into travelling to Iraq, where he was abducted by "Iranian intelligence operatives." *See* Jon Gambrell, <u>Iran executes exiled journalist who encouraged 2017 protests</u>, APNews.com (Dec. 12, 2020), https://apnews.com/general-news-151ce445a43f3e99a2e086b895ca5588

[5]    David Gritten, <u>Iran says German-Iranian died before execution could be carried out</u>, BBC.com (Nov. 6, 2024), https://www.bbc.com/news/articles/c9vng4j2jjdo ("His family believe he was kidnapped in July 2020 by Iranian agents in Dubai, where he was waiting for a connecting flight to India, and then forcibly taken to Iran via Oman.")

evidence of the charged plot and assist the jury in understanding how and why the plot unfolded as it did." *Id*.

> B. <u>Admission of the Plots Against Zam and Sharmahd Would Be Unfairly Prejudicial, Confuse the Issues, and Would Be Cumulative Evidence</u>

The Government speaks of the GOI's history of targeting dissidents and its "*modus operandi*" as being helpful to the jury in understanding the charged murder-for-hire plot, but this claim is mostly incorrect. To help the jury understand the charges in this case, the Government seeks to introduce evidence of two murders that were accomplished by means entirely dissimilar to the alleged plot in the instant case.

Federal Rule of Evidence 404(b) "permits evidence of similar acts to prove a 'signature crime,' *i.e.,* a *modus operandi* where the crimes are 'so nearly identical in method as to ear-mark them as the handiwork of the accused.'" *United States v. Mills*, 895 F.2d 897, 907 (2d Cir. 1990). The existence of a pattern, or a "recurring *modus operandi*," can be proven by evidence of "characteristics...sufficiently idiosyncratic to permit a fair inference of a pattern's existence." *United States v. Sliker*, 751 F.2d 477, 487 (2d Cir. 1984); *see also United States v. Carlton*, 534 F.3d 97, 101-02 (2d Cir. 2008) (holding that evidence of similarities between defendant's three prior bank robberies and the charged bank robbery -- "such as location, the takeover style of the robberies, or use of a getaway car" -- established "the existence of a pattern").

In regards to evidence of the "GOI's history of targeting dissidents" being helpful to the jury to understand the charged murder-for-hire plot, the Defense submits that the second category of evidence proffered by the Government, namely, "evidence of the GOI's longstanding targeting of Victim-1," (Gov't Mot. at 33) more than accomplishes that goal. Of course, the history of the GOI's targeting of Victim-1, including the alleged failed 2018 plot to lure her abroad and the similarly unsuccessful 2020-2021 plot to abduct her from New York City for rendition to Venezuela by "military-style speedboat" (S7 Indictment, ECF No. 7 at ¶4(d)), would be infinitely more helpful for the jury to understand the charged murder-for-hire plot *also involving Victim-1*.

There is little that the plots against Zam, Sharmahd, and the charged plot against Victim-1 share in common other than: (1) the intended victims were dissidents of the GOI, (2) they were targets of alleged kidnapping and/or murder plots, and (3) which were orchestrated by the GOI. The methods by which the plots against Zam and Sharmahd were carried out were categorically distinguishable to the alleged murder-for-hire plot in this case. For one thing, the plots against Zam and Sharmahd were perpetrated abroad (Iraq and Dubai, respectively). For another, Zam and Sharmahd were captured alive, transported to Iran, tried and convicted (albeit in "show trials"), imprisoned for a significant period of time (1 and 4 years, respectively), and only then were executed. Conspicuously absent from the plots against Zam and Sharmahd was any involvement by a non-Iranian criminal organization, such as alleged here. Moreover, neither Zam or Sharmahd were United States citizens, nor were they abducted from United States soil. The charged murder-for-hire plot allegedly involved a brazen public assassination of a United States citizen,[6] on a New York City street, by a member of a foreign criminal organization wielding a

---

[6]    *See* Kirsten Grieshaber, <u>Iranian American human rights activist expresses defiance over</u>

high-powered AK-47 style assault rifle. There is no basis for the admissibility of the plots against Zam and Sharmahd to prove the GOI's *modus operandi* because the charged plot against Victim-1 is, in fact, antithetical to the GOI's demonstrated "signature crimes."

Finally, the risk of unfair prejudice stemming from the admission of this evidence is only heightened against the backdrop of President Trump's recent inflammatory statements regarding the possibility of his assassination at the hands of the GOI. This risk of unfair prejudice was addressed in Mr. Omarov's second motion *in limine*, seeking a 90-day adjournment of the trial due to recent media coverage of President Trump's statements. (ECF No. 102).

IV.    **Admissions Made by Co-Defendant Amirov to a Cooperating Witness Are Inadmissible Hearsay When Offered Against Mr. Omarov (Government Motion *in Limine* No. III)**

A. Background

The Government seeks to elicit testimony from "CW-1" regarding certain incriminating statements allegedly made by co-defendant Amirov while detained pending trial at the MDC. (Gov't Mot. at 29-30, 46, 52). Specifically, statements were made by Amirov:

> "following his arrest, when he was detained. These include statements about Amirov's participation in the plot to murder Victim-1, as well as Amirov's efforts to engage with Mehdiyev while both were in custody at the MDC." [7]

*Id*. at 54. These Category 7 statements explicitly implicate Mr. Omarov in the following ways: (1) Amirov was offered $200,000 by an alleged extortion victim of Mr. Omarov's (hereinafter "Victim-2") to "solve Victim-2's issues with Omarov," (2) Victim-2 "had been making payments to Omarov in the amounts of approximately $10,000 to $15,000," (3) "when Omarov caused money to be transferred from the United States to Bulgaria, it was for Omarov's girlfriend," and (4) "Amirov also blamed Omarov for his arrest because Amirov believed Omarov had recorded everything on his cellphone." *Id*. at 29-30.

The Government argues that Amirov's Category 7 statements "were not made to law enforcement officials in response to interrogation and *Bruton* does not apply." *Id*. at 46 n. 14. Such statements *may be* admissible against Amirov as statements made by a party opponent under FRE 801(d)(2)(A). However, if the Government were to offer the Category 7 statements against Mr. Omarov, those statements are hearsay. *See United States v. Pike*, 292 F. App'x 108,

---

Iranian plots to kill her and Trump, APNews.com (Nov. 9, 2024) https://apnews.com/article/germany-us-iran-murder-plot-masih-alinejad-72e20558d5f3c2b78e16 188c85a88d8d ("[Victim-1] fled Iran following the country's disputed 2009 presidential election and became a U.S. citizen in October 2019.")

[7]    The Government classifies these statements as "Category 7" (Gov't Mot. at 53-54), and said statements will be referred to as "Category 7" herein.

112 (2d Cir. 2008) (holding that incriminating statements made by declarant co-defendant to a fellow inmate did not implicate *Crawford* or *Bruton*, but "constitute[d] hearsay when admitted against" non-declarant co-defendant and were admissible under FRE 804(b)(3)); *United States v. Green*, No. 12-CR-83S, 2017 WL 4873196, at *2 (W.D.N.Y. Oct. 27, 2017) (incriminating statements made to cooperating witnesses are not barred by the Confrontation Clause, but are not necessarily admissible because the "government will still have to establish an appropriate exception for their admission under the [FRE]").

The Government advances arguments for several exceptions to FRE 802, but none are availing. First, the Government argues that the Category 7 statements are "admissible against Amirov and Omarov as admissions of a party opponent under Rule 801(d)(2)(A)" (Gov't Mot. at 54). Second, that the Category 7 statements are "admissible against Amirov and Omarov as co-conspirator statements under Rule 801(d)(2)(E)." *Id*. at 55. And finally, that the Category 7 statements are "expose the declarant…to criminal liability, and therefore also are admissible as statements against penal interest." *Id*. at 56.

### B.    Opposing Party and Coconsponsirator Statements

To start, Amirov's Category 7 statements are obviously not admissible against Mr. Omarov as an opposing party statement under FRE 801(d)(2)(A) because Mr. Omarov did not make the statements in his individual or representative capacity.

Nor are the Category 7 statements admissible as coconspirator statements under FRE 801(d)(2)(E). To be admissible as a coconspirator's statement, the court must find: "(1) that there was a conspiracy, (2) that its members included the declarant and the party against whom the statement is offered, and (3) that the statement was made both (a) during the course of and (b) in furtherance of the conspiracy." *United States v. Rivera*, 22 F.3d 430, 435–36 (2d Cir. 1994). To be in furtherance of the conspiracy, "a statement must be more than 'a merely narrative' description by one co-conspirator of the acts of another." *United States v. SKW Metals & Alloys, Inc.*, 195 F.3d 83, 88 (2d Cir. 1999) (quoting *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1199 (2d Cir. 1989)). Rather, the statements must "prompt the listener…to respond in a way that promotes or facilitates the carrying out of a criminal activity." *United States v. Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990). However, the statements need not be commands, but are admissible if they "provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy." *Id*. at 959. The touchstone of the "in furtherance" requirement is that the statement be designed to promote the accomplishment of the conspiracy's goals. *United States v. Saneaux*, 365 F. Supp. 2d 493, 500 (S.D.N.Y. 2005).

The Category 7 statements were not made in furtherance of the murder-for-hire plot. Rather, they were merely a narrative description of acts that Amirov and Mr. Omarov allegedly committed at an earlier time. Furthermore, courts have long held that a statement made by a declarant coconspirator after their arrest is not admissible against a non-declarant defendant under FRE 801(d)(2)(E). *See Wong Sun v. United States*, 371 U.S. 471, 490-491 (1963); *United States v. Lam Lek Chong*, 544 F.2d 58, 69 (2d Cir. 1976); *United States v. Mishkin*, 317 F.2d 634,

636–37 (2d Cir. 1963) ("Hearsay statements made after a conspirator's arrest are inadmissible not because they were made after the arrest, but because they are hearsay to which the usual exception to the hearsay rule of statements by co-conspirators in furtherance of the conspiracy can no longer apply").

### C. Statements Against Penal Interest

Finally, the portions of the Category 7 statements that incriminated Mr. Omarov were not sufficiently against Amirov's penal interests to admit them against Mr. Omarov under FRE 804(b)(3). Rule 804 provides that the hearsay rule does not exclude evidence of a statement against an unavailable declarant's penal interest if the statement is one that:

> "(A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it...had so great a tendency...to expose the declarant to...criminal liability; and (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability."

Fed. R. Evid. 804(b)(3). Furthermore, courts "may not just assume for purposes of Rule 804(b)(3) that a statement is self-inculpatory because it is part of a fuller confession, and this is especially true when the statement implicates someone else." *Williamson v. United States*, 512 U.S. 594, 601 (1994); *see also Lee v. Illinois*, 476 U.S. 530, 541 (1986) ("Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence"). Therefore, a particular statement by the declarant is not within "the penal interest exception" if it incriminated the defendant "exclusively." *United States v. Wexler*, 522 F.3d 194, 202-03 (2d Cir. 2008); *see also United States v. Ojudun*, 915 F.3d 875, 886 (2d Cir. 2019) (quoting *Williamson*, 512 U.S. at 604) ("Accordingly, the court must 'inquire[ ] whether *each* of the statements in [the declarant's] confession was *truly self-inculpatory*'").

If the court finds that the statement is against the declarant's penal interest, the court must then determine whether there are corroborating circumstances indicating "both the declarant's trustworthiness and the truth of the statement." *United States v. Lumpkin*, 192 F.3d 280, 287 (2d Cir. 1999). Circumstances indicating trustworthiness include where "the statement was made to a person whom the declarant believes is an ally," *United States v. Saget*, 377 F.3d 223, 230 (2d Cir. 2004); the statement is corroborated by independent evidence, *United States v. Gupta*, 747 F.3d 111, 128–29 (2d Cir. 2014); and the declarant is not attempting to shift blame, but rather taking credit for actions committed jointly. *Saget*, 377 F.3d at 230. ("[C]ircumstances indicate that those portions of the statement that inculpate the defendant are no less reliable than the self-inculpatory parts of the statement.")

Here, the portions of the Category 7 statements that incriminate Mr. Omarov actually tend to *exculpate* Amirov in several key ways. First, Amirov explicitly blames Mr. Omarov for Amirov's arrest – this statement tends to support the view that Amirov was shifting blame to Mr.

10

Omarov out of anger and resentment. Second, Amirov states that Mr. Omarov engaged in the extortion of Victim-2, while Amirov's role was confined to being offered a large sum of money merely to "solve Victim-2's issues with Omarov." This statement exclusively implicates Mr. Omarov in an extortionate plot; and it is not self-inculpatory as to Amirov. Finally, the statement regarding Mr. Omarov "caus[ing] money to be transferred from the United States to Bulgaria, [] for Omarov's girlfriend," does not self-incriminate Amirov, rather it implicates Mr. Omarov in the money laundering conspiracy in <u>Count</u> <u>Three</u>. On the contrary, the portions of the Category 7 statements which *do* incriminate Amirov *do not* incriminate Mr. Omarov:

> "Amirov acknowledged to CW-1 that he (Amirov) was involved both in the effort to extort Victim-2 and the murder-for-hire plot against Victim-1."

> "Amirov further told CW-1, among other things, that the contract for killing Victim-1 was worth $500,000, and that Amirov had been paid $100,000 before he was arrested."

> "Amirov later contacted CW-1 using contraband cellphones and told CW-1, among other things, that he (Amirov) knew that someone was telling on him, implying that he believed it was CW-1."

Gov't Mot. at 29-30. Amirov's statements to CW-1 are a textbook example of a generally self-inculpatory narrative that is intermingled with blame-shifting. Because the Category 7 statements do not fall within any exception to Rule 802, the Court should rule that the statements are inadmissible against Mr. Omarov.

### V.    Mr. Omarov Joins Co-Defendant Rafat Amirov's Motions

The Defense respectfully seeks to join co-defendant Amirov's motions *in limine* and co-Defendant's oppositions to the Government's motions *in limine* if not inconsistent with relief sought herein.

### VI.    Conclusion

For the foregoing reasons, Defense respectfully requests that the Court deny the Government's motions *in limine*.


Dated:        February 21, 2025
              New York, New York


s/ Andrew Patel                    s/ Elena Fast                    s/ Michael Perkins
Andrew Patel, Esq.                 Elena Fast, Esq.                 Michael Perkins, Esq.
15 Chester Avenue                  The Fast Law Firm, P.C.          The Fast Law Firm, P.C.

White Plains, NY 10601           521 Fifth Ave, 17 Floor           521 Fifth Ave, 17 Floor
Phone: 212-349-0230             Phone: 212-729-9494              Phone: 212-729-9494
apatel@apatellaw.com            elena@fastlawpc.com             michael@fastlawpc.com

*Counsel for Polad Omarov*

cc:    All attorneys of record (via ECF)