UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- v. -

RAFAT AMIROV,
  a/k/a "Farkhaddin Mirzoev,"
  a/k/a "Рим,"
  a/k/a "Rome," and
POLAD OMAROV,
  a/k/a "Araz Aliyev,"
  a/k/a "Novruz Novruzzade,"
  a/k/a "Polad Qaqa,"
  a/k/a "Haci Qaqa,"

                        Defendants.

S8 22 Cr. 438 (CM)

---

**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT POLAD OMAROV'S MOTION TO SUPPRESS STATEMENTS**

MATTHEW PODOLSKY
Acting United States Attorney for the
Southern District of New York

Jacob H. Gutwillig
Matthew J.C. Hellman
Michael D. Lockard
Assistant United States Attorneys
*Of Counsel*

**TABLE OF CONTENTS**

Factual Background ........................................................................................................... 1

Applicable Law ................................................................................................................. 7

   I.   *Miranda*................................................................................................................ 7

   II.  The Unambiguous Invocation of the Right to Counsel ....................................... 9

Discussion ....................................................................................................................... 15

   I.   Omarov Knowingly and Voluntarily Waived His *Miranda* Rights................................. 15

   II.  Omarov Did Not Unambiguously Invoke His Right to Counsel ...................................... 18

Conclusion ...................................................................................................................... 23

## TABLE OF AUTHORITIES

**Cases**

*Berghuis v. Thompkins,* 560 U.S. 370 (2010) .......................................................... passim
*Colorado v. Connelly*, 479 U.S. 157 (1986)................................................................. 8
*Connecticut v. Barrett*, 479 U.S. 523 (1987)................................................................ 14
*Davis v. United States*, 512 U.S. 452 (1994)...............................................9, 10, 11, 19
*Diaz v. Senkowski*, 76 F.3d 61 (2d Cir. 1996) ......................................................10, 11
*Haynes v. Washington*, 373 U.S. 503 (1963)................................................................ 8
*Lynumn v. Illinois*, 372 U.S. 528 (1963) ..................................................................... 9
*McNeil v. Wisconsin*, 501 U.S. 171 (1991) ............................................... 12, 13, 14, 21
*Miranda v. Arizona*, 384 U.S. 436 (1966).......................................................... passim
*Oregon v. Elstad*, 470 U.S. 298 (1985)....................................................................... 8
*Soffar v. Johnson*, 300 F.3d 588 (5th Cir. 2002) ........................................................ 12
*Sundstrom v. Powell*, 960 F.2d 143 (1st Cir. 1992)..................................................... 22
*United States v. Anderson*, 929 F.2d 96 (2d Cir. 1991)................................................ 9
*United States v. Barclay*, 181 F.3d 83 (2d Cir. 1999)................................................. 12
*United States v. Berkovich*, 932 F. Supp. 582 (S.D.N.Y. 1996) ................................... 12
*United States v. Brathwaite*, No. 17 Cr. 45 (SJ), 2018 WL 1787943 (E.D.N.Y. 2018) .......... 14, 21
*United States v. Chavez*, No. 14 Cr. 185 (JAM), 2015 WL 1650838 (D. Conn. 2015) .... 13, 14, 21
*United States v. Figaro*, 568 F. Supp. 3d 459 (S.D.N.Y. 2021) ..............................11, 19
*United States v. Freeman*, No. 21 Cr. 88 (JSR), 2021 WL 3855871 (S.D.N.Y. 2021) ...................11
*United States v. Hercules*, No. 13 Cr. 54, 2014 WL 1598015 (D. Vt. 2014) .............................. 12
*United States v. Ivanson*, 2007 WL 680782, 4–6 (E.D.N.Y., 2007 ................................ 15
*United States v. Jardina*, 747 F.2d 945 (5th Cir. 1984)................................................ 21
*United States v. Jaswal*, 47 F.3d 539 (2d Cir. 1995) ..................................................... 8
*United States v. Kimble*, 905 F. Supp. 2d 465 (W.D.N.Y. 2012)................................... 12
*United States v. Lifshitz*, No. 03 Cr. 572 (LAP), 2004 WL 2072468 (S.D.N.Y. 2004)........... 14, 22
*United States v. Lights*, 208 F. Supp. 3d 568 (S.D.N.Y. 2016) ................................11, 22
*United States v. Medunjanin*, 752 F.3d 576 (2d Cir. 2014)........................................... 12
*United States v. Newton,* 2012 WL 170008, 7 (D. Vt. 2012) ....................................... 15
*United States v. Oehne*, 698 F.3d 119 (2d Cir. 2012)............................................... 9, 19
*United States v. Oladokun*, No. 15 Cr. 559 (BMC), 2016 WL 4033166 (E.D.N.Y. 2016) ............11
*United States v. Patane*, 542 U.S. 630 (2004)............................................................... 7
*United States v. Pinto-Thomaz*, 357 F. Supp. 3d 324 (S.D.N.Y. 2019)............................. 13, 14, 21
*United States v. Plugh*, 648 F.3d 118 (2d Cir. 2011).................................................8, 9, 10, 11
*United States v. Rosenfeld*, S1 23 Cr. 65 (CM) (S.D.N.Y. 2023) ................................... 12
*United States v. Scarpa*, 897 F.2d 63 (2d Cir. 1990).................................................11, 21, 22
*United States v. Taylor*, 745 F.3d 15 (2d Cir. 2014)...................................................... 8
*United States v. Touzel*, 409 F. Supp. 2d 511 (D. Vt. 2006).......................................... 12

The Government writes to respectfully in opposition to defendant Polad Omarov's pretrial motion to suppress statements he made to law enforcement after his arrest and during his extradition to the United States. (*See* Dkt. 97). After affirming he could read and understand Russian, the defendant was provided written *Miranda* warnings in Russian, indicated he understood his rights, asked a series of follow-up questions further demonstrating he understood his rights, repeatedly informed agents he wanted to answer their questions, and then did so over the course of several hours. Although the defendant now claims to the contrary, the transcript of the interview makes clear that the defendant understood his rights, waived them knowingly and intelligently, and did not unambiguously invoke his right to counsel.

The defendant does not request a hearing, and the Government submits that there is no dispute of material fact that would require one. The audio recording of the interview, submitted under separate cover as Exhibit A, and the accompanying English-language translation and transcript of the interview, attached hereto as Exhibit B, are being submitted for this Court's review. The full, verbatim, English-language translation of the interview, received by the Government on or about February 24, 2025, is the best evidence of the substance of the interview, including the defendant's clear understanding of his rights and his decision to waive them.

## FACTUAL BACKGROUND

In July 2022, Rafat Amirov and Polad Omarov, along with co-defendants Khaled Mehdiyev and Zialat Mamedov, a/k/a "Ziko"—all members of the *Vory v Zakone*, or the Russian Mob—sought to murder an Iranian-American author, journalist, and human rights activist residing in New York City ("Victim-1"). Amirov, Omarov, and Mamedov, residing in Iran and Europe at the time, provided targeting information, instructions, and operational funds to Mehdiyev, residing in New York City. Mehdiyev then surveilled Victim-1 and Victim-1's family members and residence; sent surveillance photographs and videos to Omarov and Mamedov, who, in turn,

reported to Amirov; bought a semi-automatic AK-47-style assault rifle; and made plans to carry out the murder. The plot was disrupted by the July 28, 2022, arrest of Mehdiyev by officers with the New York City Police Department ("NYPD").

Following Mehdiyev's arrest, Omarov and Mamedov continued to communicate with Mehdiyev, and updated each other and Amirov as to the status of the plot against Victim-1 while Mehdiyev was in prison. On or about January 4, 2023, authorities in the Czech Republic arrested Omarov and Mamedov. On or about January 27, 2023, Indictment S4 22 Cr. 438 (CM), Dkt. 22, was unsealed, publicly charging Amirov, Omarov, and Mehdiyev for their roles in the plot to assassinate Victim-1.

On February 7, 2024, Czech authorities granted an extradition request made by the United States. Later that month, on or about February 21, 2024, Omarov was taken into custody by FBI agents in the Czech Republic. As described below, during a flight from the Czech Republic to the United States, Omarov waived his *Miranda* rights, and made incriminating statements to law enforcement.

Immediately after Omarov was transferred to FBI custody in the Czech Republic, Omarov was evaluated by two members of the FBI who are trained as medics. After it was determined that Omarov was in good health and able to travel, members of the FBI brought Omarov on board an aircraft. From the moment Omarov was transferred to FBI custody, an FBI agent proficient in conversational Russian ("Agent-1") was present with Omarov, and acted as an interpreter between Omarov and the other members of the FBI. Once on the plane, Omarov was seated at a small table with several of the members of the FBI, and the interview was conducted at that table. Several times throughout the interview Omarov was offered food and water, and his corresponding requests were met by the agents.

2

Before the start of the interview, Omarov told Agent-1 that he wanted to answer questions, asking "they like me, right? That's why they want to talk to me. I want to explain some more." (Ex. B at 2). Within a minute, Agent-1 provided Omarov a Russian-language version of an *Miranda* warning form, known as an Advice of Rights form (the "Advice of Rights Form"). Before anything further, Agent-1 first confirmed Omarov could read the Advice of Rights Form in Russian:

Agent-1:   You read Russian, right?

Omarov:   Yes, of course.

(*Id.*). The recording immediately reflects that Omarov understood what he was reading. For example, at the timestamp on the recording at approximately 1:30, Omarov asks for the time ("What time is it? Is it American time right now here?" Ex. B at 3), as the Advice of Rights Form contains, in the top, right-hand corner, a space to indicate the time that the Advice of Rights Form is reviewed. From approximately the timestamp 1:30 through 1:50 as reflected in the recording, the recording features the sound of rustling paper, Agent-1 confirms that Omarov wishes to review the Advice of Rights Form in Russian, and then Agent-1 advises the other members of the FBI that Omarov is reviewing the Advice of Rights Form. (Ex. B at 3-4). During a period of relative quiet reflected in the recording at timestamps 2:00 to 3:18, during which Omarov did not speak, Omarov read the Advice of Rights Form. When he was finished reading it, Omarov told Agent-1 he understood it, claiming, "This thing, I know what that is." (Ex. B at 4). Agent-1 confirmed that Omarov did not have any questions about the Advice of Rights, in response to which Omarov said he had no questions and asked to verify he was signing the form in the correct place:

Agent-1:   You just have to sign it.

Omarov:   Look here, can I sign this?

Agent-1:   Yes. Sign it here, do you have questions about it, or no questions?

3

Omarov:    Here?

Agent-1:    Yes.  Do you have questions?

Omarov:    About this thing, you mean do I have questions? How do you say it, I have no questions. But I can speak with you.

(Ex. B at 4-5).

After telling Agent-1 that he understood the form and had no questions, Omarov explained to Agent-1 how he would prefer to proceed with the interview, noting "I am not going to formally respond to all your questions."  Omarov then elaborated:

Omarov:    Because I can just talk to you, we'll have the time. This issue has nothing to do with me, really. I just want to see an attorney cause I don't know your laws. But to speak that's no problem. I don't want you to think that I am hiding something. I can talk. Like I am talking with you.

Agent-1:    Yes, yes, yes.

Omarov:    But as for an official questioning, like an interrogation, I am ready for that questioning. I have been ready for a long time. But I just want to see an attorney like tomorrow so that we can during the process…

(Ex. B at 5).  Agent-1 sought immediately to clarify whether Omarov was requesting an attorney, and Omarov indicated he wished to proceed with the interview.

Agent-1:    Wait, I'll explain it to them. If you want an attorney we can stop this. Whatever you want.

Omarov:    I can speak.

Agent-1:    Yes.

Omarov:    But not like if it were an official interrogation.

Agent-1:    I understand. Let's do it like this.

Omarov:    We can have an easy going conversation.

Agent-1:    If you won't like something tell me and I'll tell them.

Omarov:    Yes.

Agent-1:    Okay?

4

> Omarov:   We can discuss all questions, I can respond to some questions and not respond to others. So, just if they don't think that it is disrespectful.

(Ex. B at 5-6).  As Agent-1 explained Omarov's answers to the other members of the FBI, an agent asked Agent-1 to clarify,[1] and Agent-1 asked Omarov again, and further confirmed Omarov's understanding that he could cease questioning if he so wished:

> Agent-1:   Do you want to talk to them without a lawyer now?
>
> Omarov:   I can.
>
> *       *       *
>
> Agent-1:   If you want to stop, you can tell them if you don't want to speak anymore they will stop it. He is just explaining that.
>
> Omarov:   So, I'll see how the questions will go and if I see something that I don't like then I can stop?
>
> Agent-1:   That's how it is.

(Ex. B at 6-7).  As reflected in the recording, transcript, and the Advice of Rights Form itself, Omarov in fact signed the Advice of Rights Form. (Def. Ex. D.)

After this exchange, the agents confirmed additional details about Omarov's medical history, allergies, and health concerns.  After Omarov confirmed he was "great…very well" (Ex. B at 10), he was reminded he should ask the agents if he wished to eat or drink anything.  (*Id*.). Over the course of the interview, Omarov was offered food, beverages, breaks, and access to the plane's restroom.  Omarov continued speaking with the agents and made numerous inculpatory statements.

In particular, Omarov made numerous statements indicating his close association with members of the Russian Mob generally and the Organization specifically; his own status as a

---

[1] The FBI agents' English statements are reflected verbatim in the attached transcript. Because Omarov does not claim to have understood them, however, they are summarized here only in substance.

"thief": his relationship with co-conspirators, including Mehdiyev and Mamedov; and that he participated in the extortion of Victim-2. For example, Omarov described his close relationship with Nadir Salifov, a/k/a "Guli," describing Nadir Salifov as "my brother" who was a "high level thief" killed in Turkey, and that Omarov "was the closest person to him." Similarly, Omarov made numerous statements about other members of the Organization, including Mamedov and Murad Akhundzada. Further, Omarov described himself as an "Azerbaijani thief," claiming that he had attained that status from Nadir Salifov. During the course of the interview, Omarov also demonstrated his knowledge of common terms and concepts used in the Russian Mob, such as ranks, like *vor* and *bradiyaga*, and the use of initiation ceremonies called *skhodkas* to elevate members of the Russian Mob to *vor* status.

Toward the end of the interview, Omarov twice acknowledged his right to counsel and to refuse to answer questions. When agents asked Omarov about his use of a cellphone as part of his criminal conduct, Omarov claimed that others had access to it. (Ex. B. at 130). Omarov then told Agent-1:

> Omarov:  The phone was on the table. Anyway, maybe there is one mistake there. Maybe there is one mistake there. I read the document, but I wanted to talk to a lawyer about it. I didn't want to talk to them. But, if the conversation went in this direction, I can answer.

> Agent-1:  [English explanation to agents: *It was sitting on the table or something. He is saying he saw one document but he wants to tell his lawyer about it.*] If you want to stop, tell me.

> Omarov:  No, I don't want to stop. I want to know this. Listen, I don't want to stop. They shouldn't think that I'm afraid of something. I have been talking for 8 hours here, I am not going to say "no" at the end.

(*Id*.). The agents and Omarov continued to discuss evidence found in cloud accounts and cellphones, and Omarov chose to terminate the interview:

> Omarov:  No, I do not confirm that [OV]. I'm just saying, right, so, I only know this man for an hour. That's his job. He's working against me. He's a

6

policeman. I'm a criminal. Explain it also. He is a policeman [OV]. That's his right, of course, this is his job.

Agent-1: [after English explanation to agents] He is saying that he is looking for truth. They can't just go arrest people.

Omarov: Okay, then let's do this. Let's do this. I will see my lawyer over there, he will confirm that this shows up on my phone, and it shows up on my…. and it is in fact on that phone, then let me think how it happened. I don't know the answer for this today.

Agent-1: Do you want to stop here or….?

Omarov: Yes, we can stop this conversation, because I don't have an answer yet.

Agent-1: You want to stop altogether, or just stop this one?

Omarov: No. Just the conversation that it shows up on my phone. I don't see that answer now. Let's stop the conversation about it. Let's stop the conversation about it.

Agent-1: Okay, that's it.

Omarov: I don't know about it yet. Do you understand?

Agent-1: Yes, I understand.

Omarov: Maybe I will say something wrong, and it will work against me tomorrow. We will do it through my lawyer, and my lawyer will confirm that phone showed up... this problem is on my phone, then I will be able to think, if it showed up here, how it showed up, what could've happened…

(Ex. B at 150-152). Although Omarov continued asking the agents questions after that point, after Omarov advised that he would not discuss their questions further without an attorney, the agents effectively ceased questioning Omarov, and the interview terminated shortly thereafter.

## APPLICABLE LAW

I.    *Miranda*

The *Miranda* rule is a "prophylactic employed to protect against violations of the Self-Incrimination Clause." *United States v. Patane*, 542 U.S. 630, 636 (2004); *see also Miranda v. Arizona*, 384 U.S. 436 (1966). "Consistent with *Miranda*, all criminal defendants must be apprised

7

of certain rights before a custodial interrogation may begin, including, of course, the right to remain silent and be afforded the assistance of counsel. But once those warnings are properly administered…a defendant is left to make his own choice as to how best to proceed." *United States v. Plugh*, 648 F.3d 118, 125 (2d Cir. 2011). When a statement is obtained through interrogation of a defendant who is in custody, the Government must demonstrate that the defendant was informed of, and validly waived, his Fifth Amendment rights under *Miranda*.

To prove a valid waiver of *Miranda* rights, the Government must show, by a preponderance of the evidence, that the defendant had a full awareness of the rights being waived and the consequences of waiving those rights, and that the defendant relinquished those rights voluntarily. *See Colorado v. Connelly*, 479 U.S. 157, 167-69 (1986); *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (per curium).   In other words, the defendant's waiver must be knowing and voluntary.   If the Government "establishes that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver." *Berghuis*, 130 S.Ct. at 2253.   Similarly, "[i]n general, a suspect who reads, acknowledges, and signs an 'advice of rights' form before making a statement has knowingly and voluntarily waived *Miranda* rights." *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014); *see also Plugh*, 648 F.3d at 127-28; *Spencer*, 995 F.2d at 11-12.

A defendant's waiver of his *Miranda* rights is *not* voluntary within the meaning of the Fifth Amendment only if it is obtained by "'techniques and methods offensive to due process' or other circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will.'" *Oregon v. Elstad*, 470 U.S. 298, 304 (1985) (quoting *Haynes v. Washington*, 373 U.S. 503, 514-15 (1963)).   Accordingly, a confession is involuntary only when it results from police misconduct.   *Colorado v. Connelly*, 479 U.S. 157, 167-69 (1986) (holding that "coercive police

8

activity is a necessary predicate to the finding that a confession is not 'voluntary'").  In conducting this voluntariness inquiry, courts look to whether the defendant's will was "overborne" by the coercive conduct of law enforcement officers such that his statements cannot be deemed to be the "product of a rational intellect and a free will."  *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) (internal quotation marks omitted).  This assessment requires "a careful evaluation of the totality of all the surrounding circumstances," including (1) "the accused's characteristics," (2) "the conditions of interrogation," and (3) "the conduct of law enforcement officials."  *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991).

## II.    The Unambiguous Invocation of the Right to Counsel

Where a suspect unambiguously invokes his right to counsel, all interrogation must cease, unless the suspect reinitiates conversation. Given this "rigid prophylactic rule," the invocation of the right to counsel must be unequivocal and unambiguous. *Davis v. United States*, 512 U.S. 452, 459 (1994); *see also Plugh*, 648 F.3d at 128 ("[F]or a defendant to invoke either the right to remain silent or the right to counsel, he must do so unambiguously"). "If a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." *Davis*, 512 U.S. at 459. Indeed, in such a situation, law enforcement does not even need to clarify whether the suspect wants to invoke his *Miranda* rights. *United States v. Oehne*, 698 F.3d 119, 123 (2d Cir. 2012) ("'If an accused makes a statement concerning the right to counsel that is ambiguous or equivocal or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights.'" (quoting *Berghuis*, 560 U.S. at 381)). "Statements such as: 'Maybe I should talk to a lawyer,'; 'Do you think I need a lawyer?'; and a suspect's statement that

9

he 'was going to get a lawyer,' have been found to be insufficient to constitute an unambiguous request for counsel." *Id.* (internal citations omitted).

The Supreme Court has explained why an accused's invocation of the right to counsel must be unambiguous:

> A requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry that avoids difficulties of proof and . . . provides guidance to officers on how to proceed in the face of ambiguity. If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression if they guess wrong. Suppression of a voluntary confession in these circumstances would place a significant burden on society's interest in prosecuting criminal activity. Treating an ambiguous or equivocal act, omission, or statement as an invocation of *Miranda* rights might add marginally to *Miranda's* goal of dispelling the compulsion inherent in custodial interrogation. But as *Miranda* holds, full comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process.

*Berghuis*, 560 U.S. at 381-82 (quotations, citations, and brackets omitted). The Supreme Court has acknowledged that "that requiring a clear assertion of the right to counsel might disadvantage some suspects who—because of fear, intimidation, lack of linguistic skills, or a variety of other reasons—will not clearly articulate their right to counsel although they actually want to have a lawyer present. But the primary protection afforded suspects subject to custodial interrogation is the *Miranda* warnings themselves." *Davis*, 512 U.S. at 460.

The "unambiguous invocation" rule accords with *Miranda* itself, which sought "to create 'clearcut' rules that could be readily understood and administered by officers." *Plugh*, 648 F.3d at 128 (quoting *Miranda*, 384 U.S. at 469). Thus, what matters is not the suspect's intent, but the clarity with which he communicates. *See Diaz v. Senkowski*, 76 F.3d 61, 64 (2d Cir. 1996) (noting that, in the absence of a "clear statement" by the suspect, *Davis* "tells us that a suspect's intent is not the controlling factor"). The unambiguous invocation rule has been described or characterized

10

as a "clear statement rule." *Davis*, 512 U.S. at 462 ("Unless the suspect actually requests an attorney, questioning may continue."); *see also Berghuis*, 130 S. Ct. at 2276 (Sotomayor, J., dissenting) (characterizing Berghuis as announcing a "clear-statement rule").

Courts have faithfully applied these principles in case after case in which defendants have expressed some interest in representation but have not done so unambiguously, including in the following cases:

- It was not an unambiguous invocation where defendant told agents, "Maybe I should talk to a lawyer." *Davis*, 512 U.S. at 462.

- It was not an unambiguous invocation where suspect told detectives, "I think I want a lawyer" and shortly thereafter asked, "Do you think I need a lawyer?" *Diaz v. Senkowski*, 76 F.3d 61, 63 (2d Cir. 1996).

- It was not an unambiguous invocation where defendant told agents, "I am not sure if I should be talking to you" and "I don't know if I need a lawyer." *United States v. Plugh*, 648 F.3d 118, 128 (2d Cir. 2011).

- It was not an unambiguous invocation where defendant told agent he "was going to get a lawyer," whom he specified. *United States v. Scarpa*, 897 F.2d 63, 68 (2d Cir. 1990).

- It was not an unambiguous invocation where defendant asked agents, "Do I need my lawyer?" *United States v. Figaro*, 568 F. Supp. 3d 459, 469 (S.D.N.Y. 2021).

- It was not an unambiguous invocation where defendant explicitly asked, "Can I call my attorney?" and then (after the agent said "Of course") clarified, "I ain't gonna call him yet." *United States v. Lights*, 208 F. Supp. 3d 568, 571-72 (S.D.N.Y. 2016).

- It was not an unambiguous invocation where defendant told agents, "I'm not saying that you're forcing my hand but do - because for now, there's no lawyer to represent me. But there is somebody that I know. I don't know whether I can talk to him? I don't know." *United States v. Freeman*, No. 21 Cr. 88 (JSR), 2021 WL 3855871, at *2 (S.D.N.Y. Aug. 27, 2021).

- It was not an unambiguous invocation where, after "ask[ing] for counsel at two points[,] ... [the defendant] immediately equivocated". *United States v. Oladokun*, No. 15 Cr. 559 (BMC), 2016 WL 4033166, at *4-5 (E.D.N.Y. July 27, 2016).

11

- It was not an unambiguous invocation where suspect asked agents whether his attorney had been notified that a search warrant had been served. *United States v. Medunjanin*, 752 F.3d 576 (2d Cir. 2014).

- It was not an unambiguous request for counsel where, after a period of questioning about a cold case homicide, the defendant stated: "maybe I do need an attorney then because if you're placing the blame somewhere." *United States v. Kimble*, 905 F. Supp. 2d 465, 468–69 (W.D.N.Y. 2012), *aff'd*, 563 F. App'x 850 (2d Cir. 2014).

- It was not an unambiguous invocation where defendant asked about the quality of court-appointed lawyers. *United States v. Berkovich*, 932 F. Supp. 582, 586 (S.D.N.Y. 1996).

- It was not an unambiguous invocation where defendant, as he was being escorted out of his home in handcuffs, told his wife to call "the attorney or the lawyer" and an arresting agent heard this statement; the statement was not made to the agent and, upon being read his rights in the agents' car minutes later, the defendant said he was willing to speak with agents. *United States v. Barclay*, Gov't Brief on Appeal, 1999 WL 33629908 (C.A.2), 63-64; *United States v. Barclay*, 181 F.3d 83 (2d Cir. 1999) (table).

- It was not an unambiguous invocation where the defendant asked the officer "if there would be legal representation in Burlington." *United States v. Touzel*, 409 F. Supp. 2d 511, 525 (D. Vt. 2006), *aff'd*, 281 F. App'x 37 (2d Cir. 2008).

- It was not an unambiguous invocation where the defendant presented a lawyer's business card to the interrogating agent in the agent's car, and thereafter the defendant requested to speak to a lawyer, but he did so in a manner that was unintelligible except for the word "lawyer." *United States v. Hercules*, No. 5:13 Cr. 54-4, 2014 WL 1598015, at *10 (D. Vt. Apr. 17, 2014).

- It was not an unambiguous invocation where the defendant repeatedly asked officer how to obtain counsel, but did not unambiguously assert right to counsel. *Soffar v. Johnson*, 300 F.3d 588, 594-95 (5th Cir. 2002).

- It was not an unambiguous invocation where the defendant conditioned his desire to speak with a lawyer on the success of his effort to cooperate. *United States v. Rosenfeld*, S1 23 Cr. 65 (CM), Dkt. Entry 73 (S.D.N.Y. Dec. 7, 2023).

There is a final—and critical—aspect of this doctrine: The *Miranda* right to counsel is triggered only by a request "that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991) (emphasis in original). A request for the assistance of counsel

12

"in some manner that does not involve assistance in responding to questions by the police does not trigger" *Miranda's* prohibition on further questioning. *United States v. Pinto-Thomaz*, 357 F. Supp. 3d 324, 338–40 (S.D.N.Y. 2019) (quoting *United States v. Chavez*, No. 14-cr-00185 (JAM), 2015 WL 1650838, at *5 (D. Conn. Apr. 14, 2015)) (emphasis supplied). Even a suspect's clear reference to a lawyer does not necessarily require cessation of questioning; it depends on what the suspect says. This aspect of the doctrine flows in part from the nature of the *Miranda* right to counsel.

Specifically, the right to counsel is guaranteed, at different times and to differing extents, by both the Fifth and Sixth Amendments. The Sixth Amendment right to counsel protects the accused at all critical stages of a prosecution. The Fifth Amendment right to counsel (or the *Miranda* right to counsel) is "both 'broader' and 'narrower' than the Sixth Amendment right to counsel." *Id.* (quoting *McNeil*, 501 U.S. at 178). It is "broader" because it "relates to interrogation regarding any suspected crime and attaches whether or not the 'adversarial relationship' produced by a pending prosecution has yet arisen." *Id.* (quoting *McNeil*, 501 U.S. at 178). It is "narrower" because "it relates only to custodial interrogation." *Id.* "While the Sixth Amendment right to counsel 'protect[s] the unaided layman at critical confrontations' with the Government generally, the *Miranda* right to counsel 'protect[s] a quite different interest: the suspect's desire to deal with the police only through counsel.'" *Id.* (quoting *McNeil*, 501 U.S. at 178).

Accordingly, *Miranda's* prohibition against further police-initiated interrogation (for those who invoke their *Miranda* rights) "applies only when the suspect has expressed his wish for the particular sort of lawyerly assistance that is the subject of *Miranda*"—*i.e.*, the assistance of counsel "in dealing with custodial interrogation by the police." *Id.* (quoting *McNeil*, 501 U.S. at 178). By contrast, a "request for the assistance of counsel in some manner that does not involve assistance

13

in responding to questions by the police" does not trigger *Miranda's* prohibition on further questioning. *Id.* (quoting *Chavez*, 2015 WL 1650838, at *5). "Those who waive their *Miranda* rights during questioning may (and often do) arrange for attorneys to represent them in the case as a whole, or in aspects of the case aside from interrogation, without invoking their *Miranda* right to counsel for assistance with present police questioning." *Id.* As a result, not every reference to a lawyer—or even request for a lawyer—prevents further questioning, as these cases illustrate:

- Defendant's request for the assistance of an attorney at a bail hearing was not a *Miranda* request for counsel. *McNeil*, 501 U.S. at 178.

- Police could question a suspect who refused to provide a written statement without the presence of an attorney, but who made clear that he was willing to give an oral statement. *Connecticut v. Barrett*, 479 U.S. 523, 527–30 (1987).

- After his arrest for securities fraud, defendant's "statement to the agent to tell his wife that he wanted a securities fraud lawyer" was not "reasonably construable as a desire for the present assistance of counsel in dealing with questioning" under the circumstances in which it was made. *Pinto-Thomaz*, 357 F. Supp. 3d at 338–40 (emphasis added).

- Defendant's request for lawyer to read advice-and-waiver-of-rights form was not a request for an attorney to represent him in connection with any questioning. *Chavez*, 2015 WL 1650838, at *6.

- Defendant's placing phone call to attorney was not an unambiguous invocation of right to counsel; "[a]t no time did the defendant state that he wanted to wait for a lawyer to continue the interview". *United States v. Lifshitz*, No. 03 Cr. 572 (LAP), 2004 WL 2072468, at *10 (S.D.N.Y. Sept. 15, 2004).

- When the defendant was asked if he wanted to proceed with an interview without having an attorney present, the defendant responded, "It's fine. I'd like to speak to an attorney, but it's f-." The Court held that this response "was not a request for counsel to assist in responding to questions by the agents." *United States v. Brathwaite*, No. 17-CR-0045 (SJ), 2018 WL 1787943, at *8 (E.D.N.Y. Mar. 27, 2018), report and recommendation adopted, No. 17 Cr. 45 (RLM), 2018 WL 1785484 (E.D.N.Y. Apr. 13, 2018) (emphasis added).

- It was not an unambiguous invocation even though defendant gave interrogating officer two business cards for two retained lawyers and even though he later called those two lawyers while in custody and in the presence of the interrogating officer, because defendant's gestures were not sufficiently

14

clear to indicate to the interrogating officer his present desire to request counsel. *United States v. Ivanson*, 2007 WL 680782, at *4–6 (E.D.N.Y. Mar. 2, 2007).

- *Miranda* did not bar questioning of suspect who invoked his right to counsel only for purpose of whether to sign a written waiver-of-rights form, noting that "after Defendant revealed that he knew how to invoke his right to counsel, he did so for the limited purpose of ensuring that he did not sign anything without consulting an attorney first," and that "[a]n invocation of counsel for a limited purpose is valid and does not automatically extend to questioning that occurs thereafter." *United States v. Newton,* 2012 WL 170008, at *7 (D. Vt. 2012).

## DISCUSSION

### I.    Omarov Knowingly and Voluntarily Waived His *Miranda* Rights

Although the defendant claims that his limited Russian skills prevented him from understanding the Advice of Rights Form (Def. Ex. A ¶ 17), thus rendering any waiver of those rights unknowing and involuntary, his own answers to questions during the interview itself as well as his conduct throughout utterly belie that claim.  First, it is uncontested that the defendant is fluent in at least spoken Russian.  Indeed, the defendant communicated with Agent-1 in Russian for several hours during the interview.  Throughout, the defendant conveyed an understanding of his case, described his years of involvement in high-level international crime, described himself as a world traveler with multiple language skills, mounted detailed challenges the Government's charges, and embraced his claimed status as a *vor*.

Second, it cannot be contested that, at the time of the interview, the defendant confidently stated that he could read Russian, contradicting his claims in the motion. When presented with the Advice of Rights Form and directly asked if he could read in the Russian language, the defendant replied, "Yes, of course."  (Ex. B at 2).  After advising Agent-1 that he could read in Russian, and quickly noting that the form required that the time he was reviewing it be indicated on the form, as evidenced by the recording, the defendant took over a minute to quietly review the form.  When he was finished, the defendant confirmed he understood the Advice of Rights Form: "This thing,

15

I know what that is." (Ex. B at 4). Agent-1 invited any questions from Omarov, asking, "do you have questions about it, or no questions?" (*Id.*). Even as Omarov attempted to confirm where he was to sign the Advice of Rights Form ("Here?"), Agent-1 continued to press Omarov for an answer, telling Omarov: "Yes. Do you have questions?" In his motion, Omarov now claims he could not understand "many of the words" in the Advice of Rights Form, but when repeatedly given the opportunity to ask any questions before signing the form, Omarov had none. Instead, he expressed his desire to speak. "About this thing, you mean do I have questions? How do you say it, I have no questions. But I can speak with you." Omarov signed the form, and the interview continued.

Omarov's understanding of his rights, described in the Advice of Rights Form, is also evidenced by his statements and approach to the interviewers' questions. Omarov told Agent-1 he would answer only those questions he chose, telling Agent-1, "I am not going to formally respond to all your questions" (Ex. B at 5). Omarov further claimed that he was ready for "an official questioning, like an interrogation" (*id*. at 5-6); that he had been prepared for the interview "for a long time" (*id.*); and that he would listen to all questions and answer some but "not respond to others" (*id*.). As discussed in greater detail below, Omarov also indicated a clear understanding of his right to counsel and that he could invoke the right to counsel when he so chose to end the questioning.

Omarov's clear responses to Agent-1's questions demonstrate not only that he understood the Advice of Rights Form, but also that his decision to waive *Miranda* was entirely voluntary. More than once, Omarov highlights the voluntary nature of the interview, expressing at the outset that he felt a rapport with the agents and did not feel pressured: "they like me, right? That's why they want to talk to me. I want to explain some more." (Ex. B at 2). After reading the Advice of

16

Rights Form, Omarov repeatedly told Agent-1 that he was ready for the interview, wanted to answer questions, and would decline any questions he felt he should not answer.

Although Omarov now claims he did not comprehend the rights he waived, he never expressed that during the interview. Instead, Omarov confidently answered Agent-1's introductory questions, and then spent hours discussing his case with the agents. In the Motion, the defendant admits that "[Agent-1] did ask Mr. Omarov whether he was able to read in Russian, and Mr. Omarov responded affirmatively," but complains that "no inquiry was ever made into his level of reading comprehension, or whether he understood his rights after he read them." (Dkt. 97 at 14). But Mr. Omarov clearly was fluent in Russian, confidently asserted his ability to read Russian ("Yes, of course."), indicated that he in fact read the document by pausing in silence, confirmed he knew what the document was, said he had no questions about it, and signed it. Under these circumstances, there was no reason or obligation for the agents to further test Omarov on his reading comprehension skills.

In his Motion, Omarov also claims that he was not asked if he understood the rights described in the Advice of Rights Form, but that claim also is plainly false. First, when he was finished reading the Advice of Rights Form, Omarov, unprompted, told Agent-1 he understood it: "This thing, I know what that is." (Ex. B at 4). Even after Omarov volunteered to Agent-1 that he understood the Advice of Rights Form, Agent-1 pressed Omarov whether he had questions about it, and Omarov replied that he did not. And, as discussed below, Agent-1 thereafter repeatedly advised Omarov about his right not to answer questions and to stop questioning without a lawyer present.

Indeed, in his Motion, despite claiming that he did not understand the Advice of Rights Form, Omarov admits that he understood his right to counsel. (Def. Ex. A ¶ 20 ("I told the agents

17

twice that I wanted to speak to an attorney before speaking to them"), 21).  As discussed more below, the defendant's request for counsel was not unambiguous because the defendant *explicitly* told the agents he did not want an attorney in connection with his questioning, but more importantly, the defendant cannot have it both ways: by his affirmation the defendant squarely admits he understood his rights after reading the Advice of Rights Form.

Accordingly, the defendant's waiver of his *Miranda* rights was knowing and voluntary.

## II.    Omarov Did Not Unambiguously Invoke His Right to Counsel

The defendant also claims that he requested counsel twice before speaking to law enforcement, but that request was ignored.  (Def. Ex. A ¶¶ 20, 32).  The transcript shows, however, that the defendant's references to an attorney either were ambiguous or, in several instances, were explicit that he had a *future* desire to speak with an attorney but wanted to proceed with the interview without one.

Omarov's claim that he twice requested counsel in connection with the interview is belied by the transcript.   Omarov's alleged invocation came after he read, acknowledged his understanding of, and signed the Advice of Rights Form.  After Omarov told Agent-1 that he would choose what questions he would answer, Omarov continued:

> Omarov:   Because I can just talk to you, we'll have the time. This issue has nothing to do with me, really. I just want to see an attorney cause I don't know your laws. But to speak that's no problem. I don't want you to think that I am hiding something. I can talk. Like I am talking with you.
>
> Agent-1:   Yes, yes, yes.
>
> Omarov:   But as for an official questioning, like an interrogation, I am ready for that questioning. I have been ready for a long time. But I just want to see an attorney like tomorrow so that we can during the process…

(Ex. B at 5).

18

Neither of Omarov's references to a lawyer were unambiguous invocations of the right to counsel for purposes of the interview. To the contrary, Omarov explicitly qualified his desire to speak to a lawyer by stating that he would do so in the future, and repeatedly stated his desire to proceed with the interview without an attorney. First, Omarov stated "I just want to see an attorney cause I don't know your laws." Immediately, however, Omarov went on at length that he wanted to talk now, without a lawyer: "<u>But to speak that's no problem</u>. I don't want you to think I am hiding something. I can talk. Like I am talking to you. But as for an official questioning, like an interrogation, I am ready for that questioning. I have been ready for a long time." Omarov's second reference to a lawyer makes it even more clear that his desire to see a lawyer was in the future, and was not in connection with the interview: "But I just want to see an attorney <u>like tomorrow</u>…."

Though not required to seek clarification, *see Davis*, 512 U.S. at 459, and *Oehne*, 698 F.3d 123; Agent-1 immediately did so, contrary to Omarov's claim that his request was ignored. In response, Omarov again made clear he was *not* requesting counsel at that time.

> Agent-1: Wait, I'll explain it to them. If you want an attorney we can stop this. Whatever you want.
>
> Omarov: I can speak.

(*Id.*).

At most, a reasonable officer under these circumstances "would have understood only that [he] might be invoking the right to counsel"—a situation which does "not require the cessation of questioning," *Davis*, 512 U.S. at 459, and does not even require that officers "ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights," *Berghuis*, 560 U.S. at 381. *See Davis*, 512 U.S. at 459; *see also United States. v. Figaro*, 568 F.Supp.3d 459, 469 (S.D.N.Y. 2021) ("Where a defendant merely references a lawyer or inquires as to the potential need for one, the law does not require agents to stop their questioning.").

19

Indeed, Omarov's statements about counsel are not even ambiguous—they can only reasonably be read as stating his intent to proceed with the interview now and speak with counsel later. In response to the very questions ("if you want an attorney we can stop this. Whatever you want.") needed to clarify Omarov's flatly equivocal statement, Omarov made clear he wanted to proceed with the interview.  Agent-1 continued to tell Omarov he could end the conversation at any time, and Omarov agreed:

Omarov:   We can have an easy going conversation.

Agent-1:   If you won't like something tell me and I'll tell them.

Omarov:   Yes.

Agent-1:   Okay?

Omarov:   We can discuss all questions, I can respond to some questions and not respond to others. So, just if they don't think that it is disrespectful.

(Ex. B at 5-6).  In spite of Omarov's repeated statements indicating willingness to cooperate and answer questions, after the English-speaking agents asked Agent-1 to clarify once more, Agent-1 asked Omarov again:

Agent-1:   Do you want to talk to them without a lawyer now?

Omarov:   I can.

(Ex. B at 6-7).

Particularly in view of Agent-1's clarifying questions, nothing about these circumstances indicates that the defendant was seeking counsel for the interrogation. To the contrary, they clearly indicate Omarov's desire to continue. These exchanges further disprove Omarov's claim in the motion that he felt "powerless" (Def. Ex. A ¶ 23) – far from bulldozing the defendant, the agents repeatedly asked the defendant if he wanted counsel, if he was sure he wanted to be interviewed,

20

and if he had any questions.  Time and again, the defendant made clear that his desire was to talk with the agents and to work with counsel at a later time to deal with the charges.

As noted above, the law requires much more for a clear invocation; Omarov clearly did not "express[ ] his wish for the particular sort of lawyerly assistance that is the subject of *Miranda*"— *i.e.*, the assistance of counsel "*in dealing with custodial interrogation by the police.*" *Pinto-Thomaz*, 357 F. Supp. 3d at 338 (quoting *McNeil*, 501 U.S. at 178).  At most, the reference to an attorney was a conditional statement about potentially obtaining counsel (akin to the defendant saying he *migh*t get a lawyer). That is a far cry from requesting "the assistance of an attorney in dealing with custodial interrogation by the police." *Id.* (*quoting McNeil*, 501 U.S. at 178). As noted above (and as illustrated by the cases above), a "request for the assistance of counsel in some manner that does not involve assistance in responding to questions by the police" does not trigger *Miranda's* prohibition on further questioning. *Id.* (quoting Chavez, 2015 WL 1650838, at *5).

The Second Circuit's decision in *Scarpa* controls. There, like here, the defendant "did not request counsel when he stated that he would get a lawyer" if he were charged. 897 F.2d at 70. "[N]or," like here, "is there any other indication that [the defendant] doubted his ability to deal with government agents on his own." *Id.* Instead, the defendant held a prolonged conversation with law enforcement agents. *See also United States v. Jardina*, 747 F.2d 945, 949 (5th Cir. 1984) (no invocation of counsel where defendant "never asked that counsel be present at ongoing questioning" and instead all defendant requested was that he "wished his attorney to work out a cooperative deal with the government in the future"). Like in *Scarpa*, this case presents a "self-confident defendant who knew whether and when he wanted an attorney." *Scarpa*, 897 F.2d at 70. And so, the defendant's passing statement of getting a lawyer to discuss how his case should be

21

viewed in light of American law was not an invocation of his right to counsel that required the agents "to cease all inquiry." *Id.*

Following *Scarpa*, courts in this Circuit hold that a desire to consult a lawyer at a later time "does not trigger the right to counsel." *United States v. Lights*, 208 F. Supp. 3d 568, 575 (S.D.N.Y. 2016); *United States v. Brathwaite*, 2018 WL 1787943, at *9 (E.D.N.Y. Mar. 27, 2018), report and recommendation adopted, 2018 WL 1785484 (E.D.N.Y. Apr. 13, 2018) (no invocation of counsel where "defendant affirmatively told the agents several times that he wanted to talk to them" even though he noted he would "'like to speak to an attorney'"); *United States v. Lifshitz*, 2004 WL 2072468, at *9 (S.D.N.Y. Sept. 15, 2004) ("[T]he defendant did not 'unequivocally express' his desire to have counsel present by merely placing a telephone call to a lawyer, during which the defendant merely stated, at best, that he wanted the recipient to be his lawyer."); *see also Sundstrom v. Powell*, 960 F.2d 143 (1st Cir. 1992) (defendant's request that he "wanted counsel 'later,' unequivocally foreswore a desire for counsel at that very instant and unequivocally expressed a desire for counsel in the future").

After hours of speaking with the agents, the defendant reaffirmed that he understood his rights and had not invoked earlier when, in connection with questions regarding the evidence in the case, Omarov indicated he would only discuss those facts with an attorney ("we will do it through my lawyer" (Ex. B at 150-152)).  The defendant did not unambiguously request an attorney in connection with his interview.  Instead, he repeatedly made clear—in the face of numerous clarifying questions from the agents—that he wanted to talk to the agents about the case, would answer only the questions he was comfortable answering, and knew he could seek attorney advice as the questions if he so chose.  Eventually, he did, and the agents stopped questioning after that.

22

**<u>CONCLUSION</u>**

For the foregoing reasons, the Court should deny the defendant's motion to suppress his post-arrest statements in its entirety.

Respectfully submitted,

MATTHEW PODOLSKY
Acting United States Attorney

By:         /s/
Jacob H. Gutwillig / Michael D. Lockard
Matthew J.C. Hellman
Assistant United States Attorneys
(212) 637-2215 / 2193 / 2278

cc:    Defense Counsel (by ECF)

23