UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| - v. - | S8 22 Cr. 438 (CM) |
| RAFAT AMIROV,<br>    a/k/a "Farkhaddin Mirzoev,"<br>    a/k/a "Рим,"<br>    a/k/a "Rome," and<br>POLAD OMAROV,<br>    a/k/a "Araz Aliyev,"<br>    a/k/a "Novruz Novruzzade,"<br>    a/k/a "Polad Qaqa,"<br>    a/k/a "Haci Qaqa,"<br><br>        Defendants. | |

## THE GOVERNMENT'S OMNIBUS REPLY IN OPPOSITION TO OMAROV'S MOTION FOR SEVERANCE AND THE DEFENDANTS' NEW MOTIONS *IN LIMINE*

MATTHEW PODOLSKY
Acting United States Attorney for the
Southern District of New York
26 Federal Plaza
New York, New York 10278

Jacob H. Gutwillig
Matthew J.C. Hellman
Michael D. Lockard
Assistant United States Attorneys
    *Of Counsel*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

ARGUMENT ......................................................................................................... 2

    I.   The Defendants Should Be Tried Together ................................................. 2

        A.  Relevant Background .................................................................... 2

        B.  Applicable Law .............................................................................. 6

        C.  Discussion ................................................................................... 12

   II.  The Defendants' Other Motions In Limine Should Be Denied ................................. 20

        A.  Amirov's Motion to Preclude Evidence of Racketeering Activity Should Be Denied ...................................................................... 20

        B.  The Defendants' Motions To Preclude Use of the Phrase "Russian Mob" Should Be Denied ................................................. 21

CONCLUSION .................................................................................................... 21

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                     <u>Page</u>

*Bourjaily v. United States*, 483 U.S. 171 (1987) ........................................................................... 9

*Glenn v. Bartlett*, 98 F.3d 721 (2d Cir. 1996)................................................................................. 9

*Richardson v. Marsh*, 481 U.S. 200 (1987) ............................................................................. 6, 15

*United States v. Ahmed*, 94 F. Supp. 3d 394 (E.D.N.Y. 2015) ................................................... 22

*United States v. Amato*, 15 F.3d 230 (2d Cir. 1994) .............................................................. 7, 10

*United States v. Arline*, 660 F. App'x 35 (2d Cir. 2016).............................................................. 17

*United States v. Arrington*, 867 F.2d 122, at 130 (2d Cir. 1989)................................................. 18

*United States v. Attanasio*, 870 F.2d 809 (2d Cir. 1989) .............................................................. 6

*United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181 (2d Cir. 1989)................................. 17

*United States v. Bowe*, 221 F.3d 1183 (11th Cir. 2000) .............................................................. 10

*United States v. Carson*, 702 F.2d 351 (2d Cir. 1983).......................................................... 8, 17

*United States v. Casamento*, 887 F.2d 1141 (2d Cir. 1989) ........................................................ 13

*United States v. Delligatti*, No. 15 Cr. 491 (JSR), 2018 WL 1033242 (S.D.N.Y. 2018) ............ 17

*United States v. Delva*, No. 12 Cr. 802, 2014 WL 4460360 (S.D.N.Y. 2014) ........................... 18

*United States v. Desena*, 260 F.3d 150 (2d Cir. 2001), ............................................................... 10

*United States v. Doyle*, 130 F.3d 523 (2d Cir. 1997)................................................................... 12

*United States v. Dupree*, 870 F.3d 62 (2d Cir. 2017) .................................................................. 18

*United States v. Feyrer*, 333 F.3d 110 (2d Cir. 2003) .............................................................. 6, 8

*United States v. Gigante*, 166 F.3d 75 (2d Cir. 1999) ............................................................ 9, 17

*United States v. Gotti*, No. 02 Cr. 743 (RCC), 2004 WL 602689 (S.D.N.Y. 2004)................ 7, 12

*United States v. Green*, 887 F.2d 25 (1st Cir. 1989)..................................................................... 9

*United States v. Gupta*, 747 F.3d 111 (2d Cir. 2014) ................................................................... 9

*United States v. Hernandez*, 85 F.3d 1023 (2d Cir. 1996)............................................................. 8

*United States v. Johnson*, 469 F. Supp. 3d 193 (S.D.N.Y. 2019) ................................................ 18

*United States v. Kelly*, 462 F. Supp. 2d 191 (E.D.N.Y. 2020)..................................................... 21

*United States v. Kincaid*, No. 10 Cr. 160, 2013 WL 5595404 (E.D. Tenn. 2013) ...................... 22

*United States v. Lang*, 589 F.2d 92 (2d Cir. 1978) ..................................................................... 12

*United States v. Losada*, 674 F.2d 167 (2d Cir. 1982)...................................................................8

*United States v. Lyles*, 593 F.2d 182 (2d Cir. 1979)..................................................................10

*United States v. Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990)...........................................10

*United States v. Matthews*, 20 F.3d 538 (2d Cir. 1994)............................................................12

*United States v. Panza*, 750 F.2d 1141 (2d Cir. 1984) ..............................................................7

*United States v. Persico*, 645 F.3d 85 (2d Cir. 2011) ...............................................................11

*United States v. Pirro*, 76 F. Supp. 2d 478 (S.D.N.Y. 1999)......................................................7

*United States v. Potamitis*, 739 F.2d 784 (2d Cir. 1984) ...........................................................8

*United States v. Rahme*, 813 F.2d 31 (2d Cir. 1987). ...............................................................10

*United States v. Rastelli*, 870 F.2d 822 (2d Cir. 1989) .............................................................10

*United States v. Rivera*, 22 F.3d 430 (2d Cir. 1994).................................................................9

*United States v. Rosa*, 11 F.3d 315 (2d Cir. 1993) .............................................................7, 16

*United States v. Russo*, 302 F.3d 37 (2d Cir. 2002).................................................................12

*United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998)...............................................................7

*United States v. Sampson*, 385 F.3d 183 (2d Cir. 2004)........................................................7, 20

*United States v. Sasso*, 59 F.3d 341 (2d Cir. 1995) .................................................................18

*United States v. Savoca*, 335 F. Supp. 2d 385 (S.D.N.Y. 2004)...............................................18

*United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007) .................................................................6

*United States v. Stratton*, 779 F.2d 820 (2d Cir. 1985) ............................................................10

*United States v. Tarantino*, 846 F.2d 1384 (D.C. Cir. 1988).....................................................9

*United States v. Turoff*, 853 F.2d 1037 (2d Cir. 1988) ..............................................................6

*United States v. Wexler*, 522 F.3d 194 (2d Cir. 2008) ..............................................................11

*Williamson v. United States*, 512 U.S. 594 (1994). ...................................................................11

*Zafiro v. United States*, 506 U.S. 534 (1993)..................................................................6, 7, 8, 15

**Statutes**

Title 18, United States Code, Section 1959 ..............................................................................3, 20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

    - v. -

RAFAT AMIROV,
  a/k/a "Farkhaddin Mirzoev,"
  a/k/a "Рим,"
  a/k/a "Rome," and
POLAD OMAROV,
  a/k/a "Araz Aliyev,"
  a/k/a "Novruz Novruzzade,"
  a/k/a "Polad Qaqa,"
  a/k/a "Haci Qaqa,"

          Defendants.

S8 22 Cr. 438 (CM)

---

The Government respectfully submits this memorandum of law in further support of its February 7, 2025 motions *in limine* (*see* Dkt. 104, "Govt. MILs"), and to respond to the February 21, 2025 motions *in limine* by defendant Polad Omarov (*see* Dkt. 112 at 1-4) requesting severance from co-defendant Rafat Amirov and preclusion of certain of Amirov's statements; by defendant Rafat Amirov (*see* Dkt. 6-8) requesting preclusion of evidence of racketeering activity; and by both defendants requesting preclusion of the term "Russian Mob." For the reasons explained below, the Government respectfully submits that:

1. Omarov's severance motion should be denied because Omarov cannot overcome the presumption in favor of joint trials as evidence of the Organization, a racketeering enterprise hired to commit the murder-for-hire of Victim-1, is admissible as direct evidence of the existence of the charged murder-for-hire and money laundering conspiracies, as well as of the charged racketeering offense, and pursuant to Rule 404(b);

2. Amirov's statements to CW-1 while incarcerated at the MDC are admissible as to Omarov pursuant Rule 801(d)(2)(E) as co-conspirator statements, Rule 804(b)(3) as statements against penal interest, and, in any event, admissible against Amirov pursuant to Rule 801(d)(2)(A) as a statement of a party opponent and do not result in unfair

prejudice to Omarov, and can be properly cabined through limiting instructions;[1]

3. Amirov's motion to preclude evidence of racketeering activity should be denied because it is effectively a motion to dismiss Count Four by removing a question of fact for the jury; and

4. The defendants' motion to preclude use of the term "Russian Mob" because the term is accurate, commonplace, and central to the charged case.

## <u>ARGUMENT</u>

### I.    The Defendants Should Be Tried Together

Defendant Polad Omarov moves for severance from co-defendant Rafat Amirov, citing the "extremely high risk of unfair prejudice that would result" from a joint trial in the event Counts Four and Five are severed from the upcoming trial as to Omarov during the pending Czech decision regarding waiver of the Rule of Specialty as to those counts only. (Dkt. 112 at 1). Even assuming Omarov were not tried on those counts, severance would not be appropriate, because the same evidence proving Omarov and Amirov were members of a RICO enterprise is admissible at any trial regarding the murder-for-hire charged in Counts One and Two that enterprise was hired to commit.

### A.    Relevant Background

As the Court is aware, after Omarov was extradited to the United States, superseding indictments S7 22 Cr. 438 and S8 22 Cr. 438 were filed, adding attempted murder in aid of racketeering (Count Four) and firearms use and possession in connection with that (Count Five) to the charges against Omarov and Amirov. (*See* Dkt. 71). Because Omarov was extradited on

---

[1] Amirov and Omarov raised additional motions *in limine* in their responses to the Government's motions *in limine* (*see* Dkt. 110, 112). With respect to any such motions not addressed in this memorandum, the Government will either provide a supplemental response in advance of the pretrial conference scheduled for February 26, 2025 or will address those motions orally at the conference.

the charges in an underlying indictment, the Government has asked the Czech Republic to waive the Rule of Specialty as to Counts Four and Five.  The Czech Republic has not yet granted the waiver or determined whether such a waiver is required as a matter of Czech law.  Neither Omarov nor Amirov are charged in Count Six of the operative S8 Indictment.[2]

As discussed in greater detail in the Government's motions *in limine*, and as is clear from the face of the S4 Superseding Indictment (which does not include Counts Four and Five) and S8 Superseding Indictment (which does), Counts Four and Five stem from precisely the same conduct underlying Counts One through Three—that is, the plot to murder the person identified as Victim-1 in both indictments.  As both Superseding Indictments make clear, Omarov and Amirov were members of a criminal organization (the "Organization") that engaged in criminal activity in the United States and abroad, including theft, extortion, assault, kidnapping, and murder.  Members of the Organization, including the defendants, identified themselves as "Thieves-in-Law" or as followers of Thieves-in-Law, referred to themselves as "Ogru,"[3] and used common symbols to mark themselves as members of the Organization.  The defendants were hired to murder Victim-1 because of their membership and participation in the Organization, and used another member of the Organization to attempt to kill Victim-1 with an AK-47-style firearm in Brooklyn, New York.

The S8 Superseding Indictment further alleges the Organization constituted an "enterprise," as that term is defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce.  The S8 Superseding Indictment further defines the purposes of

---

[2] The Government respectfully submits that a decision by the Czech Republic determining the Rule of Specialty is either inapplicable or waived prior to the commencement of trial in this case would moot the defendant's motion for severance.

[3] "Ogru" means "Thief" in the Azerbaijani language.

the Organization, as well as its means and methods, in a manner consistent with the descriptions of the Organization in the S4 Superseding Indictment, noting the Organization engaged in acts involving murder, assaults, robberies, kidnapping, extortion, arson, other acts of violence, intimidation and other threats of physical and economic harm to accomplish its aims. In particular, the S8 Superseding Indictment alleges that the defendants committed the attempted murder of Victim-1 through the use of a firearm as an act of violence in aid of the Organization's racketeering enterprise. The evidence at any trial of Counts One through Three will be the same whether Counts Four and Five are submitted as to Omarov to a jury or not. In other words, even if Omarov were severed and tried separately on Counts One through Three, evidence of his membership in the Organization, his association with his co-conspirators in the murder-for-hire through crimes committed by the Organization, and his involvement in the murder-for-hire conspiracy because of his membership in the Organization all would be admissible as direct evidence of Counts One through Three.

That evidence includes statements Amirov made to CW-1 while both were in custody in the United States. As set forth in the Government's motions *in limine*, Amirov acknowledged to CW-1 that he (Amirov) was involved both in the murder-for-hire plot against Victim-1 and the effort to extort Victim-2. (*See* Govt. MILs at 30-31). Specifically, the Government expects that CW-1 will testify that Amirov told CW-1, in substance and among other things, the following:

- Nadir Salifov, a/k/a "Guli," a *vor* in the Russian Mob, had named Amirov a *vor* in approximately 2013.

- Amirov had been the one sending Omarov information about Victim-1, in connection with the murder-for-hire plot. Amirov blamed Omarov for Amirov's arrest because Amirov believed that Omarov had maintained records on Omarov's phone. Amirov questioned whether Omarov was a "singer"—that is, an informant—because Omarov kept all this information on his cellphone, which was inappropriate behavior for a *vor*.

- The contract for killing Victim-1 was worth $500,000, and Amirov had already been paid $100,000 before he was arrested. The $500,000 was supposed to be divided equally between Amirov and Omarov, and CW-1 was supposed to be paid $50,000—$30,000 from Amirov and $20,000 from Omarov. When Omarov caused money to be transferred from the United States to Bulgaria (a portion of the $30,000 that Amirov and Omarov transferred to Mehdiyev), it was for Omarov's girlfriend.

- After Amirov left Iran, shortly before his arrest, someone called and told him not to leave Iran because the FBI was looking for him. By the time Amirov received the warning he was outside Iran. Amirov was able to pass Amirov's phone to an associate.[4]

- Amirov was wanted in Russia in connection with murder charges there. Amirov believed that Russia would get Amirov transferred from Russia to the United States, and then Amirov would be released, because the Russian and Azerbaijani governments have a relationship.

- Amirov expected was that they would be released from custody in approximately two-to-three months. Amirov suggested that, because CW-1 knew English, CW-1 should gather other inmates around CW-1 for the purpose of remaining in the United States after their expected release and pursuing crimes, like extortion, with CW-1 in America.

- Amirov did not believe CW-1 was cooperating but had previously discussed the possibility that CW-1 was cooperating with authorities just in case it was true. Amirov did not give his new phone number to Omarov because Amirov was worried that something might happen.

- Victim-2 had offered to pay Amirov $200,000 to solve Victim-2's issues with Omarov, and Victim-2 had been making payments to Omarov in the amounts of approximately $10,000 to $15,000.

These statements relate to Amirov, Omarov, and CW-1's membership in the Organization, their participation in the plot to murder Victim-1, their efforts to extort Victim-2, and continuing updates about the affairs of the conspiracy and its members, including efforts to understand potential Government informants and strategies the co-conspirators should consider relevant to what

---

[4] After Amirov told CW-1 about the phone, Amirov used an intermediary to contact CW-1 and direct CW-1 to contact Amirov's associate using that phone number.

Amirov anticipated as possible outcomes for the case. Amirov's statements CW-1 were followed by additional efforts to engage with CW-1, including, as set forth in the Government's motions *in limine*, Amirov's repeated attempts to contact CW-1 using contraband cellphones from jail, as well as telling CW-1, among other things, that Amirov knew that someone was "telling on him," implying that he believed it was CW-1. (Govt. MILs at 31).

### B. Applicable Law

#### 1. Joinder

Rule 8(b) of the Federal Rules of Criminal Procedure governs joinder of offenses and defendants. *United States v. Turoff*, 853 F.2d 1037, 1042-43 (2d Cir. 1988). The rule provides that an "indictment . . . may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). The Second Circuit has interpreted Rule 8(b) to allow joinder of offenses and defendants where two or more persons' criminal acts are "unified by some substantial identity of facts or participants or arise out of a common plan or scheme." *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003) (quoting *United States v. Attanasio*, 870 F.2d 809, 815 (2d Cir. 1989)). In this context, courts "apply a 'commonsense rule' to decide whether, in light of the factual overlap among charges, joint proceedings would produce sufficient efficiencies such that joinder is proper notwithstanding the possibility of prejudice to either or both of the defendants resulting from the joinder." *United States v. Shellef*, 507 F.3d 82, 98 (2d Cir. 2007) (citing *Turoff*, 853 F.2d at 1044).

There is a "preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993); *see* Fed. R. Crim. P. 8(b). "Joint trials play a vital role in the criminal justice system." *Richardson v. Marsh*, 481 U.S. 200, 209 (1987). They promote efficiency and "generally serve the interests of justice by avoiding

6

inconsistent verdicts and enabling more accurate assessment of relative culpability—advantages which sometimes operate to the defendant's benefit." *Id.* at 210. When defendants are properly joined under Rule 8, a defendant seeking severance under Rule 14 shoulders a "heavy burden of showing that joinder will result in substantial prejudice." *United States v. Amato*, 15 F.3d 230, 237 (2d Cir. 1994); *United States v. Sampson*, 385 F.3d 183, 190 (2d Cir. 2004) (noting that to prevail on a severance motion, a "defendant must show not simply some prejudice but substantial prejudice").

The presumption in favor of joint trials is so strong that the Second Circuit has stated that the "principles that guide the district court's consideration of a motion for severance usually counsel denial." *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993). Therefore, it is not enough for a defendant to show that he "may have a better chance of acquittal in [a] separate trial[]." *Zafiro*, 506 U.S. at 540. Rather, "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539; *see also United States v. Panza*, 750 F.2d 1141, 1149 (2d Cir. 1984) (explaining that prejudice must be "sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials").

The presumption in favor of joint trials "is particularly strong where, as here, the defendants are alleged to have participated in a common plan or scheme." *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998); *United States v. Gotti*, No. 02 Cr. 743 (RCC), 2004 WL 602689, at *6 (S.D.N.Y. Mar. 26, 2004). "[T]he cases are legion that there is a strong public interest in joint trials where, as here, the defendants are . . . charged in the same conspiracy." *United States v. Pirro*, 76 F. Supp. 2d 478, 483 (S.D.N.Y. 1999) (collecting cases). In conspiracy

cases, the court's evaluation of the potential for substantial prejudice must take into account that once a defendant is a member of a conspiracy, "all the evidence admitted to prove that conspiracy, even evidence relating to acts committed by co-defendants, is admissible against the defendant." *Salameh*, 152 F.3d at 111. As such, the mere fact that evidence may be admitted concerning acts committed by a joined co-defendant is not, standing alone, sufficient to warrant severance. "The fact that one of several codefendants is tried for a crime not committed by another codefendant does not, without more, create the sort of miscarriage of justice that would require [severance]." *United States v. Hernandez*, 85 F.3d 1023, 1029 (2d Cir. 1996).

Even where some evidence is admissible against only one defendant in a multi-defendant case, that does not necessarily require severance. The Second Circuit has repeatedly recognized that "the fact that evidence may be admissible against one defendant but not against another does not necessarily require a severance." *United States v. Carson*, 702 F.2d 351, 367 (2d Cir. 1983); *see also United States v. Losada*, 674 F.2d 167, 171 (2d Cir. 1982). Any spillover prejudice that may occur as a result of trying defendants jointly is generally corrected by the court's instruction that the jury consider the guilt of each defendant individually, an instruction that jurors are presumed to be able to follow. *United States v. Potamitis*, 739 F.2d 784, 790 (2d Cir. 1984); *see also Zafiro*, 506 U.S. at 540-41. In fact, even when the "risk of prejudice is high . . . less drastic measures—such as limiting instructions—often suffice as an alternative to granting a Rule 14 severance motion." *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003); *see also Zafiro*, 506 U.S. at 538-39 ("Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion.").

### 2.  CC Statements

Rule 801(d)(2)(E) provides in relevant part that "[a] statement is not hearsay if ... the statement is offered against an opposing party and was made by the party's co-conspirator during

and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). To admit a statement pursuant to this rule, a district court must find two facts by a preponderance of the evidence: first, that a conspiracy that included the defendant and the declarant existed; and second, that the statement was made during the course and in furtherance of that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). A statement is made in furtherance of a conspiracy if "designed to promote or facilitate achievement of the goals of that conspiracy." *Glenn v. Bartlett*, 98 F.3d 721, 728 (2d Cir. 1996). A statement need not be made by one co-conspirator to another co-conspirator in order to be in furtherance of a conspiracy. *United States v. Green*, 887 F.2d 25, 27–28 (1st Cir. 1989) (coconspirator's statement to shooting victim admissible against co-defendant under Rule 801(d)(2)(E)); *see United States v. Gupta*, 747 F.3d 111, 125 (2d Cir. 2014) (a statement need not be made to a member of the conspiracy to be admissible under Rule 801(d)(2)(E) because "[s]tatements designed to induce the listener's assistance with respect to the conspiracy's goals satisfy the Rule's in-furtherance requirement").

Although only co-conspirator statements made "in furtherance" of the conspiracy are admissible under Rule 801(d)(2)(E), the standard for what qualifies as a statement "in furtherance" of a conspiracy is not restrictive. The requirement that the challenged statement be "in furtherance of" the conspiracy is satisfied if the statement's objective is "designed to promote or facilitate achievement of the goals of the conspiracy." *United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994). It permits, for example, introduction of any co-conspirator statement that "reasonably [can] be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988).

The Second Circuit has held that co-conspirator statements that "provide reassurance, or seek to induce a co-conspirator's assistance, or serve to foster trust and cohesiveness or inform each other as to the progress or status of the conspiracy" further the ends of the conspiracy, *United States v. Desena*, 260 F.3d 150, 159 (2d Cir. 2001), as do statements "that apprise a co-conspirator of the progress of the conspiracy," *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987). *See United States v. Amato*, 15 F.3d 230, 234 (2d Cir. 1994) (statement apprising co-conspirator in loansharking conspiracy of status of loan was made in furtherance of the conspiracy); *United States v. Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989) (statement among conspirators that defendant was receiving proceeds of extortion was in furtherance of conspiracy because it informed conspirators of status of conspiracy).

Although the Government must demonstrate that the defendant and the declarant belonged to the same conspiracy, the conspiracy need not be one charged in the indictment. *See United States v. Lyles*, 593 F.2d 182, 194 (2d Cir. 1979) ("It is settled law that the conspiracy which serves as the vehicle for the introduction of a vicarious admission by a co-conspirator need not be charged in the indictment."); *United States v. Bowe*, 221 F.3d 1183, 1193 (11th Cir. 2000) ("[T]he conspiracy that forms the basis for admitting a coconspirator's out of court statements need not be the same conspiracy for which the defendant is charged."); *see also United States v. Stratton*, 779 F.2d 820, 829 (2d Cir. 1985) ("[I]t is not necessary that the Government charge a conspiracy to take advantage of Fed. R. Evid. 801(d)(2)(E)."); *United States v. Maldonado-Rivera*, 922 F.2d 934, 962 (2d Cir. 1990) (same).

### 3. Rule 804(b)(3): Statements Against Interest

Under Rule 804, if a declarant is "unavailable," there is an exception to the hearsay rule where:

(A) a reasonable person in the declarant's position would have made [the

> statement] only if the person believed it to be true because, when made, it was
> so contrary to the declarant's proprietary or pecuniary interest or had so great
> a tendency to invalidate the declarant's claim against someone else or to expose
> the declarant to civil or criminal liability; and

> is supported by corroborating circumstances that clearly indicate its
> trustworthiness, if it is offered in a criminal case as one that tends to expose
> the declarant to criminal liability.

Fed. R. Evid. 804(b)(3). This rule "is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Williamson v. United States*, 512 U.S. 594, 599 (1994).

To satisfy Rule 804(b)(3), the proponent of the statement must show by a preponderance of the evidence: "(1) that the declarant is unavailable as a witness, (2) that the statement is sufficiently reliable to warrant an inference that a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true, and (3) that corroborating circumstances clearly indicate the trustworthiness of the statement." *United States v. Wexler*, 522 F.3d 194, 202 (2d Cir. 2008) (internal quotation marks omitted). A declarant is unavailable for purposes of Rule 804 if, as relevant here, the declarant is "exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies," Fed. R. Evid. 804(a)(1), or "is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure the declarant's attendance or testimony," *id.* 804(a)(5)(B).

"A statement will satisfy Rule 804(b)(3)'s requirement that it 'tended' to subject the declarant to criminal liability if it would be probative in a trial against the declarant." *United States v. Persico*, 645 F.3d 85, 102 (2d Cir. 2011) (internal quotation marks omitted). Moreover, a declarant need not "be aware that the incriminating statement subjects him to immediate criminal prosecution," but instead, that the "incriminating statement sufficiently tended to subject the

declarant to criminal liability so that a reasonable man in his position would not have made the statement unless he believed it to be true." *United States v. Lang*, 589 F.2d 92, 97 (2d Cir. 1978) (internal quotation marks and citation omitted).

Finally, the Second Circuit requires corroboration of both the declarant's and the statement's trustworthiness. *United States v. Doyle*, 130 F.3d 523, 543-44 (2d Cir. 1997). Statements made to co-conspirators, not in response to questioning, and not made in coercive atmospheres are sufficiently reliable for purposes of this Rule. *See, e.g.*, *United States v. Matthews*, 20 F.3d 538, 546 (2d Cir. 1994).

### 4. Rule 801(d)(2)(A): Statement of a Party Opponent

Federal Rule of Evidence 801(d)(2)(A) provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party in an individual or representative capacity." Fed. R. Evid. 801(d)(2)(A); *see also United States v. Russo*, 302 F.3d 37, 43 (2d Cir. 2002) ("Statements made by the defendant may be introduced by the government in a criminal trial to prove the truth of the facts stated in them because they are admissions of an adverse party."). Moreover, statements made by a defendant are admissible under this exception even if the statement, on its face, is not incriminating. *See, e.g.*, *United States v. Gotti*, 457 F. Supp. 2d 395, 401-402 (S.D.N.Y. 2006) ("Cases explaining that an admission must be contrary to a position taken by the party at trial do so to distinguish Rule 801(d)(2)(A) from the more limited exception for statements against interest under Rule 804(b)(3), which must be against the declarant's interest at the time when made.").

### C. Discussion

#### 1. Omarov's Severance Motion Should Be Denied

Omarov's severance motion falls far short of overcoming the strong presumption in favor of a joint trial. Omarov and Amirov are charged with the same offenses in Counts One, Two, and

Three; and, even assuming *arguendo* that Counts Four and Five were to be severed as to Omarov, the facts underlying those charges are the same as those alleged in the first three counts. The distinction between the murder-for-hire and money laundering counts (One, Two, and Three) and the attempted murder in aid of racketeering and associated firearms offense (Four and Five) is a legal one—namely, that Amirov, Omarov, and others attempted to murder Victim-1 to maintain and increase their roles in the Organization. The evidence, however, is wholly coextensive, because proof their participation in the Organization, which predates their attempts to murder Victim-1, goes to numerous admissible purposes solely relating to Counts One, Two, and Three, including to establish the relationship between and among the co-conspirators, provide critical context for the murder-for-hire plot, and pursuant to Rule 404(b). (*See* Govt. MILs at 42-47). Omarov is therefore unable to meet the "extremely difficult burden" of showing that he would be so prejudiced by joinder—where three of the five counts, and all the underlying conduct, would be the same—that he would be denied a fair trial. *United States v. Casamento*, 887 F.2d 1141, 1149 (2d Cir. 1989) (internal quotation marks and citation omitted).

Omarov's argument for severance proceeds from faulty premises about the nature, scope, and admissibility of the Government's RICO-related evidence. The defendant erroneously claims that there is only "partial factual overlap between the murder-for-hire plot in Counts One and Two and the proof of the RICO Enterprise in Count Four . . . ." (Dkt. 112 at 3). To the contrary, there is a near-total factual overlap in the evidence the Government would offer at trial. That includes, among other things, extensive electronic communications between and among Amirov, Omarov, CW-1, and others, detailing, step-by-step, their plans to murder Victim-1. Much of the evidence the Government anticipates offering at trial comes from the defendants' cellular devices and electronic accounts, which contain communications, images, and videos cataloguing their efforts

to kill Victim-1. But nearly all of this this evidence, which is directly relevant to the murder-for-hire plot, involves Amirov's and Omarov's status as members of the Russian Mob—because it was their leadership as organized crime members and their common history that not only led to their hiring to murder Victim-1 in the first place, but also informed how they went about their attempts to commit that murder, including their relationship of trust in working with each other and their involvement of other Russian Mob members in the plot. This evidence is therefore essential to, and indistinguishable from, the relationship whereby Amirov, who was in Iran for a portion of the charged conspiracy, tasked Omarov, who was then located in various Eastern European countries, with directing CW-1, who was in the United States, to murder Victim-1. The plot to murder Victim-1 arose from their prior criminal activities on behalf of the Organization—including, specifically, the plot to extort Victim-2. As that plot failed to advance, despite numerous attempts at extortion using violence, the defendants turned to a potentially more lucrative opportunity, and one that would increase their stature in the Russian Mob: murdering Victim-1. That the co-conspirators were already extorting Victim-2 from abroad using CW-1 and others and evaluating the continued extortion of Victim-2 in view of the politics underlying their membership in the Organization paved the way for their rapid pivot to targeting Victim-1. In other words, the Organization's structure and already ongoing criminal activities in New York allowed it to quickly accept the contract to murder Victim-1.

That Amirov and Omarov would be tried together for these crimes makes sense. As Omarov concedes, "[i]t is true that the prejudicial spillover justifying severance is 'an unlikely occurrence when all the defendants are charged under the same conspiracy count[.]'" (Dkt. 112 at 3 (internal citations omitted)). In the face of that clear law, the defendant nevertheless argues that evidence relating to the RICO Enterprise involves "extortion, kidnapping, murder and attempted

murder" (*id.*), whereas the murder-for-hire plot does not. Limited only to Counts One, Two, and Three, the charged conduct is explicitly attempted murder with a firearm, and the extortion of Victim-2 is the immediate precursor to this activity, which was even discussed approximately contemporaneously by Omarov and CW-1. Omarov attempts to draw a distinction between, on the one hand, a murder-for-hire plot committed by members of the Organization—which was part of the Russian Mob—and, on the other, a murder-for-hire plot committed by members of a RICO enterprise—which was part of the Russian Mob. That supposed delta is solely reflects that the Organization is also an enterprise engaged in racketeering activity, which a legal conclusion. The evidence at each trial should, therefore, be the same.

The defendant also seemingly erects, then rejects, the strawman argument regarding "copious" RICO evidence that "dwarfs what would be admissible as 'background' on the murder-for-hire charges." (*Id.*). Omarov claims he would be denied a fair trial if relevant evidence of his membership in the Russian Mob were offered against him to prove that he pursued a murder-for-hire plot with his co-conspirators in the Russian Mob, but Omarov's arguments ignore the measures far short of severance that would suffice to mitigate any "serious risk" that Omarov would fail to receive a fair trial. *See Zafiro*, 506 U.S. at 539 (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987) ("A district court, therefore, "should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of [a defendant], or prevent the jury from making a reliable judgment about guilt or innocence" and, even in those rare instances where a defendant establishes a 'high' risk of prejudice, 'less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.'"). If Counts Four and Five were severed as to Omarov, the Government could—and, in the exercise of effective trial strategy, would—take steps to focus its RICO-related evidence, so as not to overwhelm the core murder-

for-hire plot, and the necessary background, in the way that Omarov contends it would. Even that honed trial evidence would, regardless of whether Omarov proceeds on Counts Four and Five, involve the same witnesses, and, to the extent of any RICO-related evidence found to be admissible as to Amirov but somehow unfairly prejudicial to Omarov, limiting instructions from the Court could be easily fashioned to ensure the jury understood the particularized purposes for which the evidence was offered.

"[T]he principles that guide the district court's consideration of a motion for severance usually counsel denial." *United States v. Rosa,* 11 F.3d 315, 341 (2d Cir. 1993). For the reasons set forth above, that also is the case here.

### 2. Amirov's Statements to CW-1 Are Admissible Against Both Defendants

For reasons that are outlined in the Government's motions *in limine*, and which accord with the Government's position regarding severance outlined above, Amirov's in-custody statements to CW-1, described *supra*, are admissible against each defendant at any trial in this case. Because evidence of the Organization that conspired to commit Counts One through Three is coextensive with evidence of the Organization that is the enterprise underlying count Four, and because the Government's evidence will prove that the conspiracy continued well after CW-1, Omarov's, and Amirov's arrests to the time that Amirov made the statements at issue to CW-1, the statements are plainly admissible pursuant Rule 801(d)(2)(E) as co-conspirator statements. That analysis, for the reasons outlined above, is unchanged even in the event of severance of Counts Four and Five for Omarov. Even if the statements did not fall under the co-conspirator hearsay exception, they are Rule 804(b)(3) as statements against penal interest, and, in any event, admissible against Amirov pursuant to Rule 801(d)(2)(A) as a statement of a party opponent where limiting instructions could cure any potential prejudice to Omarov.

16

First, Amirov's statements to CW-1 are admissible against Amirov and Omarov as co-conspirator statements under Rule 801(d)(2)(E).  Amirov's statements collectively serve to update CW-1—whom Amirov expressly stated was believed to be a continuing member of the conspiracy at the time of the conversation—on the affairs of the conspiracy, explain background and motive for the conspiracy relevant to Amirov's and Omarov's continued participation in the conspiracy. *See, e.g.*, *United States v. Delligatti*, No. 15 Cr. 491 (JSR), 2018 WL 1033242, at *6 (S.D.N.Y. Feb. 23, 2018) ("[S]tatements that convey information about others in the same organized crime syndicate are considered to be during and in furtherance of a conspiracy").  Amirov's statements also directly seek CW-1's assistance in recruiting associates to help with the affairs of the conspiracy in anticipation of (what Amirov believed would be) their imminent release from custody—whereupon the affairs of the conspiracy would continue. *See Gigante*, 166 F.3d at 82 (finding "in furtherance" requirement met where statements "induce a coconspirator's assistance"); *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1199 (2d Cir. 1989) (finding "in furtherance" requirement met where statements "prompt the listener to respond in a way that facilitates the carrying out of criminal activity" (internal quotation marks omitted)); *see also Desena*, 260 F.3d at 159; *Rivera*, 22 F.3d at 436; *Tarantino*, 846 F.2d at 1412.  Additionally, Amirov's statements relate to Omarov's and Amirov's concern that CW-1 could be cooperating with the Government, and, later, statements CW-1 understood to be accusations that CW-1—or somebody else—was providing information to the Government and needed to stop.  These are admissible as co-conspirator statements because they are designed "to make sure [a co-conspirator does] not consider turning against the conspiracy" and "motivate [the individual's] continued participation" in the conspiracy.  *See United States v. Arline*, 660 F. App'x 35, 41 (2d Cir. 2016) (quoting *United States v. Carson*, 455 F.3d 336, 367 (D.C. Cir. 2006)).  Moreover, a "plot to

silence [a] witness[ ]" is admissible as a co-conspirator statement, because the plot "furthers the goals of the conspiracy in that the [conspiracy's objectives] would be facilitated by the acquittal of all the defendants." *United States v. Johnson*, 469 F. Supp. 3d 193, 213 (S.D.N.Y. 2019) (quoting *United States v. Arrington*, 867 F.2d 122, at 130 (2d Cir. 1989); *see also United States v. Delva*, No. 12 Cr. 802, 2014 WL 4460360, at *10 (S.D.N.Y. Sept. 10, 2014) ("Statements made to hide the existence or activities of a conspiracy are made in furtherance of it.").

Second, Amirov's statements to CW-1 would be admissible against Amirov and Omarov pursuant to Rule 804(b)(3) as statements against penal interest because the declarant, Amirov, is unavailable, in that he is Omarov's co-defendant and "exempted from testifying about the subject matter of the declarant's statement" because his 5th Amendment privilege against self-incrimination applies. *See* Fed. R. Evid. 804(a)(1); *see also United States v. Savoca*, 335 F. Supp. 2d 385, 390 (S.D.N.Y. 2004) ("[T]he 'unavailability' component is established by the fact that [the declarant] is expected to invoke his Fifth Amendment privilege.").[5] Amirov's statements also were against his penal interest because they "implicated [the declarants] in [illegal] activity," and each declarant "would not have made the statement unless he believed it to be true." *United States v. Dupree*, 870 F.3d 62, 80 (2d Cir. 2017); *see also Ortiz*, 962 F. Supp. 2d at 573. These statements are also sufficiently reliable because they were made in confidence to CW-1, a fellow member of the Russian Mob, and was told by Amirov that Amirov did not believe CW-1 was cooperating with law enforcement, *i.e.*, explicitly "a person whom the declarant[s] believe[d] [was] an ally, not a law enforcement official." *United States v. Sasso*, 59 F.3d 341, 349 (2d Cir. 1995).

---

[5] At trial, the Government expects that Amirov will be advised that the decision of whether to testify is in his discretion. Either he will decline to do so, in which case he will be unavailable; or, in the alternative, if he elects to testify, he can be asked about his statements to CW-1.

Omarov's arguments to the contrary are unavailing. He misconstrues Amirov's statements to CW-1 and argues, confusingly, that "Amirov's statements to CW-1 are a textbook example of a generally self-inculpatory narrative that is intermingled with blame-shifting." (Dkt. 112 at 11). Amirov's statements are certainly inculpatory—he admits to, among other things, being warned not to leave Iran because the FBI wanted him, a clear reference to the charged crime; that he was to receive $500,000 to kill Victim-1; and that he was a *vor* in the Russian Mob. Taken independently or together, Amirov's statements are a complete admission to the charged offense— he was paid as a member of the Russian Mob to use the Organization to kill Victim-1. To the extent Amirov engaged in any "blame-shifting," it is only Amirov's laments regarding potential law enforcement cooperation by confederates and Omarov's sloppiness with respect to the destruction of evidence expected of fellow *vory*.

The examples Omarov provides are misleading and taken out of context. For example, the defense cites Amirov blaming Omarov for Amirov's arrest as a sign of Amirov's resentment. Rather, as Amirov explained, Omarov failed to delete relevant communications and information from his "phone," which, as the trial evidence will show, was, in fact, stored in Omarov's Apple account. Amirov is not claiming that he, Amirov, did not commit the crime; he's explaining that he, Omarov, and CW-1 were caught before Omarov failed to destroy relevant evidence. Similarly, as to Victim-2, Amirov admits his involvement; and, again, as the Government anticipates the evidence will show, Omarov took a primary role in that extortion plot. Omarov also grasps at straws in attempting to construe Amirov's description of payments in connection with the murder-for-hire plot, including Omarov's instructions to send $10,000 to a girlfriend in Bulgaria, as entirely casting blame on Omarov. As is clear from those statements, and under the relevant law, Amirov, a presumptively unavailable witness, made inculpatory statements to CW-1, a person in

a position of trust by virtue of their shared association in the Organization that was hired to commit the charged crimes.

Finally, even in the event that Amirov's statements are admissible only as to Amirov pursuant to Rule 801(d)(2)(A) as a statement of a party opponent they remain admissible at a joint trial of Amirov and Omarov given appropriate limiting instructions.  As set forth in the Government's motions *in limine*, neither are these statements unduly prejudicial under Rule 403. (*See* Govt. MILs at 57-59).

## II.   The Defendants' Other Motions *In Limine* Should Be Denied

### A.    Amirov's Motion to Preclude Evidence of Racketeering Activity Should Be Denied

Amirov argues that evidence of the Organization's involvement in racketeering activity should be denied because Amirov is not connected to the alleged acts of extortion, kidnapping, and arson committed by the Organization.  (Amirov MIL Opp. at 6-8).

Amirov's motion should be denied, most fundamentally, because it is effectively a motion to dismiss Count Four by removing a question of fact for the jury.  Amirov is charged in Count Four with committing attempted murder in aid of racketeering activity.  The grand jury found probable cause to believe that Amirov committed the attempted murder of Victim-1 (a) as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity; or (b) for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity.  18 U.S.C. § 1959.  The Government is not required to prove that Amirov was involved in all of the Organization's racketeering activity, only that the Organization existed as a racketeering enterprise and that Amirov committed the attempted murder for one of the purposes defined in § 1959.  Amirov cannot seek pretrial dismissal of this count, *see United States v. Sampson*, 898 F.3d 270, 281-82

(2d Cir. 2018); nor can the Government be precluded from offering evidence of the existence of a racketeering enterprise, here, the Organization, to prove that count. "The Government is entitled to marshal and present its evidence at trial, and the defendant is entitled to challenge the sufficiency of that evidence pursuant to Rule 29 of the Federal Rules of Criminal Procedure." *See United States v. Kelly*, 462 F. Supp. 2d 191, 197 (E.D.N.Y. 2020).

Moreover, the Government expects that the evidence will show that Amirov was involved in, among other things, the Organization's plot to extort the owner of a grocery store located in Brooklyn (Victim-2). Among other things, Amirov admitted to CW-1 that he had offered to resolve threats against Victim-2 in exchange for a payment of $200,000 and that Amirov was aware that Victim-2 had been making payments to Omarov. (Gov't MIL at 32-31). The evidence of the Organization and its racketeering activities are relevant to the charges against Amirov.

Accordingly, Amirov's motion should be denied.

### B.    The Defendants' Motions To Preclude Use of the Phrase "Russian Mob" Should Be Denied

Both defendants move to preclude the use of the word "Russian" to describe the Russian Mob, arguing that references to Russia are unduly prejudicial and there is an insufficient factual basis for the phrase. Omarov MIL Opp. at 4-5; Amirov MIL Opp. at 8. These motions should be denied.

As alleged in the Superseding Indictment, the defendants (along with others) are members of the *Vory v Zakone*, or Russian Mob, and particularly a racketeering enterprise comprised of a subgroup of Russian Mob members. Though many members of the Russian Mob are not, in fact, Russian, the name derives from the Soviet era when the Russian Mob rose to prominence and the Government expects that the evidence will demonstrate that it is a term (including variants like "Russian Mafia") that is commonly applied in academic literature, in common parlance, and by

21

Russian Mob members themselves. The Government further expects the evidence will show that several characteristics of the Russian Mob are directly relevant to the charged offenses, including evidence of its hierarchical structure with *vors* in the highest position of power and respect; recognized means for Russian Mob members to advance their stature and rank; and factional dynamics within the Russian Mob whereby members affiliate closely with a particular *vor* and sometimes engage in rivalries, including violent rivalries, with other *vors* and their loyal followers.

The defendants generally argue that the phrase should be precluded because the Russian Mob lacks a strict hierarchy (Amirov MIL Opp. at 8); because the defendants and their associates in the Organization are not Russian (*id.*; Omarov Opp. at 5); and because the jury may have negative views of Russia (*id.*), a "geopolitical rival of the United States." (Amirov MIL Opp. at 8). There is little chance the jury will be confused about the defendants' national origins, which are relevant only to the extent that it relates to their associations with each other and other members of the Russian Mob; and little reason to expect that the use of the phrase will cause nationalistic bias. The use of the phrase is rooted in fact and the evidence, reflects how members of the Russian Mob view and speak about themselves, and is relevant to the charges. *See, e.g., United States v. Ahmed*, 94 F. Supp. 3d 394, 435-36 (E.D.N.Y. 2015) ("[T]here is no basis to preclude the Government from using words that are central to the case."); *see also id.* ("Defendants assert that these words are prejudicial and inflammatory and amount to legal conclusions that must be left for the jury to determine. Defendants' request is unnecessary and impractical."); *cf. United States v. Kincaid*, No. 10 Cr. 160, 2013 WL 5595404, at *3 (E.D. Tenn. Oct. 11, 2013) ("[T]he fact that a term has a negative connotation does not mean that it violates Rule 403.").

The motions should be denied.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court should deny defendant Polad Omarov's motion to sever and to exclude statements made by Amirov to CW-1 while both were in custody in the United States; and deny the defendants' other motions *in limine*.

Dated: New York, New York
       February 25, 2025

Respectfully submitted,

MATTHEW PODOLSKY

Acting United States Attorney for the
Southern District of New York

By:    _____*/s/*_____

Jacob H. Gutwillig
Matthew J.C. Hellman
Michael D. Lockard
Assistant United States Attorneys
212-637-2215 / 2278 / 2193

Cc:    Defense Counsel
       (Via ECF & Email)

23