

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza*
*New York, New York 10278*

March 8, 2025

**BY ECF**

Honorable Colleen McMahon
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

> Re:    ***United States v. Rafat Amirov and Polad Omarov***,
>         **S8 22 Cr. 438 (CM)**

Dear Judge McMahon:

The Government respectfully submits this letter seeking an order precluding (1) proposed computer experts and (2) a proposed organized crime expert by defendant Rafat Amirov from offering certain opinions identified in Amirov's supplemental expert disclosure because the disclosure does not identify "the bases and reasons for them."  Fed. R. Crim. P. 16(b)(1)(C).[1] Specifically, the Government seeks to preclude the following proposed opinions:

### The Computer Experts

- "In this case, the presence of VPN activity indicates that users may have been logging in from more than one location."

- "Multiple users in the same location would also trigger similar, and possible the same correlations using the same IP address."

### The Organized Crime Expert

- "Nadir "Guli" Salifov's clan was a financially stable and well-respected faction of Thieves-in-Law."

- "After Guli died, the line of succession within his faction was unclear.  Not all *vory* recognize the authority of *vor* status of Namik Salifov, the brother of Guli and man who ran Mr. Mehdiyev and Mr. Omarov's faction of Thieves-in-Law."

---

[1] The Government does not seek to preclude the proposed experts based on their qualifications.

- "Mr. Amirov's status as a *vor* may have been unstable following the death of his sponsor, Guli, as there were rumors of attempts by other *vory* to decrown him.  This would make it even more necessary for Mr. Amirov to avoid deviating from the Code to avoid further destabilizing his status."

## I.    Background

### *The Computer Experts*

On February 27, 2025, the Court issued an order precluding Amirov's proposed experts, Clark C. Walton and Edgar Fritz. (Dkt. 121.) The Court held that Amirov's expert disclosure did not meet the requirements of Rule, *id*. at 4-5 & 7-9; and set a deadline of March 4, 2025, for Amirov to provide supplemental expert notice that satisfies Rule 16's requirements. *Id*. at 8-9.

On March 3, 2025, Amirov provided a supplemental expert disclosure for Mr. Clark and Mr. Fritz, which is attached hereto as Exhibit A (omitting the proposed experts' qualifications). The proposed expert testimony of both witnesses is identical. The disclosure identifies several topics of background testimony, and three proffered opinions. The proposed background testimony consists of the following:

- Pen Register Trap and Trace (PRTT) mechanisms capture and track phone numbers and electronic communications. PRTT data only provides certain information about targeted communications. Such data does not reveal the content of messages, or the identity of users sending and receiving which messages outside of numbers/usernames. (Ex. A at 1.)[2]

- VPN services can be used to obfuscate the activity of individuals and their locations by assigning Internet Protocol (IP) addresses not directly attributable to that user. IP addresses for mobile carriers change frequently; IP addresses are accurate as to location to some extent, but not perfect, particularly with mobile IPs because they are so fleeting, and part of an IP address block associated with multiple users at a time. . . . Although VPN users can select the country with which they want to associate their location, they cannot choose the IP address itself. (*Id*. at 1-2.)

- WhatsApp is a free private messaging service used by billions of people around the world. Although WhatsApp data travels encrypted, it can generally be extracted from smartphones in a decrypted matter for forensic review. Other apps, such as Signal and Telegram, have additional barriers to make it harder to retrieve decrypted data from a device. WhatsApp is also difficult to log out of; it can only be done if the account is removed from a device entirely. WhatsApp messages did not, at the relevant time period, appear across multiple

---

[2] Because the notice for both proposed experts is identical, citations in this letter will be to Mr. Walton's disclosure.

devices, absent an affirmative setting to upload messages to another location, for instance, iCloud.[3] (*Id*. at 2.)

- Apple iCloud accounts are cloud services provided by Apple to users to store and sync data across Apple devices. To be detached from a particular device, users must log out of iCloud accounts; otherwise, dependent on device settings, all backed up data may be retained by the same iCloud across all devices which are logged into the account (assuming the relevant setting to sync data is turned on).[4] (*Id*.)

The disclosure identifies the following three opinions:

- Activity in the PRTT data indicates that the WhatsApp Account associated with +380735677777 was still being used throughout 2023, following the January 2023 arrest of Rafat Amirov; therefore, another party had access to the account. The post-arrest activity was not limited to passive activity, such as simply receiving emails and texts. The IP addresses that correlate with this data indicate that the individual using the account accessed it over time from multiple locations.[5] (*Id*. at 1.)

- In this case, the presence of VPN activity indicates that users may have been logging in from more than one location. (*Id*. at 2.)

- Multiple users in the same location would also trigger similar, and possibly the same, correlations using the same IP addresses. (Ex. A at *Id*.)

The Government seeks to preclude the latter two opinions.

The disclosure indicates that the proffered opinions are based on the proposed experts' review of "government discovery indexed for easier searching and review in a forensic tool called Magnet AXIOM," "review[ ] of certain mobile device and cloud data in the Cellebrite tool," and "regular monitoring of technical and press reports, upon which a network and mobile telecommunications forensics expert would ordinarily rely." (*Id*.)

---

[3] The Government expects that the evidence will show this proposed testimony is incorrect. WhatsApp content backed up to an iCloud account can only be accessed from the device that has the WhatsApp account installed on it. Other devices logged in to the same iCloud account cannot access the backed-up WhatsApp data.

[4] This proposed testimony about access to backed-up data is incorrect with respect to backed-up WhatsApp data, as described above.

[5] The Government does not seek to preclude this opinion. The Government's expert agrees that, after the date of Amirov's arrest, a different individual continued to use the WhatsApp account. The fact that the account switched hands (*i.e.*, was used by Amirov before his arrest and another individual after his arrest) is demonstrated by, among other things, a change in the device used to access the account, the relocation of that device to Azerbaijan, a marked drop in the frequency of the account's use and change in the numbers the account was used to contact, and a near discontinuation of reliance on VPN services.

### *The Organized Crime Expert*

On March 3, 2025, Amirov provided an expert disclosure for Mr. Emin Gurbanov, which is attached hereto as Exhibit B.  The disclosure identifies background testimony and three proffered opinions.  The proposed background testimony regards the *"unwritten code of behavior"* to which *vory* subscribe, set forth by Amirov as follows:

- Members cannot cooperate with law enforcement, especially national governments.  (Ex. B at 2.)

- *Vory* cannot work non-criminal jobs, because their profession is theft, and they cannot carry firearms.  (*Id.* at 2.)

- *Vory* are not permitted to kill anyone unless that person has physically injured, or injured the honor of, a member of Thieves-in-Law. Even in these circumstances, *vory* can lose their status if they target family members or women, which is never permitted. (*Id.* at 2-3.)

- They must only make money from crimes. The code means that financial gain cannot solely motivate *vory*'s activities.  (*Id.* at 3.)

- Half of the *vory*'s "earnings" go into a common fund, which exists to be of use to them if there is need for financial assistance for its members and inmates in prisons.  (*Id.*)

- *Bradiaga*, who are a step below *vors* in Thieves-in-Law's structure, commit crimes in the name of their *vor*, and the *vor* in turn receives tribute from his *bradiaga*'s criminal activity. (*Id.*)

- Individuals must earn, and can lose, their *vor* status in accordance with the code. They must be a person with authority who follows the code of Thieves-in-Law.  (*Id.*)

- Participating in murder-for-hire or murder plots, unless as a matter of personal honor, would jeopardize a *vor's* status in Thieves-in-Law, and would be used against participating *bradiaga* to prevent their ever becoming a *vor*.  (*Id.*)

The disclosure identifies the following three opinions:

- Nadir "Guli" Salifov's clan was a financially stable and well-respected faction of Thieves-in- Law.  (*Id.*)

- After Guli died, the line of succession within his faction was unclear. Not all *vory* recognize the authority or *vor* status of Namik Salifov, the brother of Guli and man who ran Mr. Mehdiyev and Mr. Omarov's faction of Thieves-in-Law.  (*Id.*)

- Mr. Amirov's status as a *vor* may have been unstable following the death of his sponsor, Guli, as there were rumors of attempts by other *vory* to decrown him. This would make it

even more necessary for Mr. Amirov to avoid deviating from the Code to avoid further destabilizing his status. (*Id.*)

The Government seeks to preclude these three opinions.

The disclosure indicates that the proffered opinions are based on Mr. Gurbanov's "training and experience" as a police officer and organized crime analyst in Moscow, as well as his time "studying and teaching criminal law with a focus on organized crime." (*Id.*) Mr. Gurbanov's experience included "analyz[ing] intercepted information from calls and videos between and among members of organized criminal groups, including *vory*" covering "upwards of an estimated 6,000 hours of calls, videos, and confidential informants' audio recordings, particularly from detention centers, as well as text messages, related to organized crime investigations, including conversations between and among *vory*." (*Id.*)[6]

## II.    Relevant Law

Federal Rule of Evidence 702 provides that expert testimony that "assists the trier of fact to understand the evidence or to determine a fact in issue," may be admitted if "the testimony is based on sufficient facts or data," and "is the product of reliable principles and methods" that have been reliably applied "to the facts of the case."

The party proffering the expert's opinions "has the burden to establish the [Rule 702] admissibility requirements, with the district court acting as a 'gatekeeper' to ensure that the expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *In re Pfizer Inc. Secs. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016) (cleaned up). In particular, as the Second Circuit has noted, "[u]nder Rules 701 and 702 [of the Federal Rules of Evidence], opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence that wastes time." *Hygh*, 961 F.2d at 363 (internal quotation omitted).

In fulfilling this gatekeeping role, the Court should first determine whether the proffered expert testimony is relevant: whether it "has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Next, the court must determine "whether the proffered testimony has a sufficiently 'reliable foundation' to permit it to be considered." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, "(1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (cleaned up). Expert testimony should be excluded if it is "speculative or conjectural" or is "conclusory." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008). The

---

[6] Amirov's counsel has advised the Government that Mr. Gurbanov did not investigate the defendants or other members of their organization as its particular members have been identified by the Government, but has generally investigated criminals who are members of the *vory v zakone,* or the Thieves-in-Law.

testimony must also "fit" the facts of the case at issue. *See, e.g.*, *LVL Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 641-42 (S.D.N.Y. 2016) (Noting that "the testimony must be both reliable *and* relevant in that it 'fits' the facts of the case" and finding proposed expert testimony "fails the *Daubert* 'fit' requirement.") (emphasis in original).

Rule 16(b)(1)(C) requires the defendant to disclose, for any expert testimony the defendant intends to elicit in the defendant's case-in-chief, "a complete statement of all opinions that the defendant will elicit from the witness in the defendant's case-in-chief" and "the bases and reasons for them," among other things.  *See, e.g.*, *United States v. Weiner*, No. 22 CR. 19 (PGG), 2024 WL 82729, at *6 (S.D.N.Y. Jan. 8, 2024) (rejecting as deficient defense's expert disclosures where they did not adequately disclose the "bases and reasons" for the conclusions set forth therein).

In addition, "[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004); *see also Sec. & Exch. Comm'n v. Am. Growth Funding II, LLC*, 16 Civ. 828 (KMW), 2019 WL 1772509, at *1 (S.D.N.Y. Apr. 23, 2019) ("Opinions concerning state of mind are an inappropriate topic for expert opinion.") (quoting *Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 09 Civ. 3020 (SAS), 2011 WL 6288415, at *8 (S.D.N.Y. Dec. 15, 2011)); *Sec. Inv. Protection Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 81 B.R. 370, 380 (Bankr. S.D.N.Y. 2017) (collecting cases); *Linde v. Arab Bank, PLC*, 920 F. Supp. 2d 282, 285 (E.D.N.Y. 2011) ("[O]pinions as to the state of mind, intent, or motive of a government, a charitable entity, or a person . . . do not contain relevant expert evidence.").

## III.    Discussion

### *The Computer Experts*

The challenged opinions should be precluded because the disclosure does not sufficiently identify the bases upon which the proposed conclusions are based. The disclosure indicates only that the proposed opinions are based on a review of discovery, pen register data, VPN information, and mobile device and cloud data.

The Government's disclosures, in contrast, have been detailed and voluminous. In addition to the Government's initial expert disclosure, the Government has produced notes of meetings with its expert witness pursuant to 18 U.S.C. § 3500; spreadsheets detailing the precise data that the expert analyzed, the methodologies applied to that data, and the results that the analysis yielded; and a draft PowerPoint presentation reflecting the expert's data, methodologies, and conclusions. This includes specific pen register data; identification of the portions of the pen register data that are relevant to the expert's analysis of usage of Amirov's WhatsApp account; particular files and associated metadata sent to or received by the WhatsApp account and correlating files stored in Amirov's iCloud[7] account; data associating Amirov's iCloud account with the iPhone recovered from him at the time of his arrest; data indicating that Amirov's WhatsApp account was accessed

---

[7] The fact that Amirov is the user of the relevant iCloud account is amply demonstrated by a wealth of personal content stored in that account, and the fact that it is registered to an iPhone 13 Pro seized at the time of Amirov's arrest.

from a single device throughout the time period of the charged offenses; and data demonstrating that the WhatsApp account changed devices and users after Amirov's arrest.

For example, the Government's disclosures identify 135 instances between September 26 and November 2, 2022, that Amirov's iCloud account and the WhatsApp account were accessed from the same IP address within less than a minute, including 85 times they were accessed in less than 30 seconds and three times they were accessed in the same second. The disclosures further identify 109 times between July 13 and November 2, 2022, that the two accounts were accessed from the same IP address over three or more consecutive logins, sometimes over a period of several ours. The disclosures further detail at least two occasions in October 2022 when the two accounts were being accessed from the same IP addresses that resolve to locations where, at precisely the same times, Amirov was also located and where he was taking pictures and having pictures of himself taken. In addition, the disclosures detail photographs stored in Amirov's iCloud account that were also sent from his WhatsApp account, and specifies the electronic evidence showing that the WhatsApp account was accessed from a single iPhone 13 Pro (the same type of phone as Amirov's) between at least October 2021 and September 2022, the available data date range. *See Salvino, Inc.*, 542 F.3d at 311; *LVL Brands, Inc.*, 209 F. Supp. 3d at 641-42.

The inadequacy of Amirov's disclosure is highlighted by the ambiguity of the proposed opinions. Amirov's proposed experts' first opinion is that "the presence of VPN activity indicates that users may have been logging in from more than one location." But the disclosure does not say what VPN activity, what account or accounts are at issue, or what is meant by "users." *See Salvino, Inc.*, 542 F.3d at 311; *LVL Brands, Inc.*, 209 F. Supp. 3d at 641-42.

To make matters worse, the next opinion appears to contradict the first: "Multiple users in the same location would also trigger similar, and possibly the same, correlations using the same IP addresses." Apparently, the proposed experts believe that the electronic data is consistent both with one or more unidentified accounts or devices being accessed by multiple users in different locations, *and* with multiple users of one or more unidentified accounts or devices being in the same location as each other.

The Government's expert has concluded that both of these scenarios are, as a practical matter, impossible and inconsistent with the relevant data, for reasons and analyses reflected in the Government's disclosures. But the Government is utterly unable to understand Amirov's proposed experts' opinions, much less analyze or test them, because the disclosure gives no indication on what information they are based, how the proposed experts assessed that information, and how they reached their proposed conclusions. *See* Dkt. 121 at 4-5.

### The Organized Crime Expert

The challenged opinions should be precluded because the disclosure does not sufficiently identify the bases upon which the proposed conclusions are based; at least one opinion, regarding Amirov's possible status as a *vor* and his adherence to the Thieves' Code, consists of impermissible motive or intent testimony; and the Court's March 6, 2025 ruling should preclude testimony by the defendant's proposed expert as to the "general activities" of the defendant's criminal organization. (Dkt. 134 at 4)

The disclosure cites only Gurbanov's analysis of "calls, texts, videos, and confidential informants' audio recordings in his law enforcement capacity, his law enforcement activities in Moscow, and his academic work."[8]  While these credentials *may* form the basis of testimony regarding Mr. Gurbanov's general knowledge of the so-called Thieves' Code that applied to the *vory v zakone*, the disclosure does not identify a single specific piece of evidence relating to Mr. Gurbanov's purported knowledge of what the Court has defined as "Guli's Vor."  (Dkt. 134 at 2)

In addition to voluminous disclosures by the Government related to CW-1, who describes Guli's Vor in detail, the Government has provided in discovery, and marked as trial exhibits, hundreds of text messages, photos, videos, documents, and articles demonstrating the defendants' connections to the *vory v zakone* system of organized crime and Guli's Vor in particular. Additionally, there are numerous online resources—news sites, forums, tribute sites, and social media—with information related to the defendants and their participation in Guli's Vor the Government has referenced in discovery and its own expert disclosures.  These websites are also popular forums that would be immediately familiar to anyone who has investigated or studied organized crime.

The Government has provided, for example, numerous images and videos taken from the defendants' online cloud accounts and devices featuring references to Nadir "Guli" Salifov and Namik Salifov, interpolated with articles discussing, for example, Omarov's alleged international campaign of murder against Guli's enemies and those responsible for his assassination, as well as materials linking Omarov, Amirov, the Salifovs, and the power struggles within the group following Guli's death.  By contrast, it is totally unclear how Mr. Gurbanov's review of calls and informant materials in Moscow of groups *other than* Guli's Vor have informed his opinion that either defendant is a member of that organization, their relative positions in it, and the opinions of other organization members and rivals as to either Namik Salifov's or Rafat Amirov's authority as *vory*.

This may be why the opinion as to Amirov appears to be, at best, an educated guess.  The disclosed opinion is that Amirov's *vor* status "*may*" have been unstable after Guli's murder.  (Ex. B at 3) (emphasis added). The disclosure further explicitly links that possibility to "rumors of attempts" by other crime bosses to "decrown" Amirov.  Notwithstanding the defendant's failure to articulate any particular bases for the proffered opinions, this particular opinion is speculative at best.  Moreover, even if the witness could source these rumors, the conclusion that Amirov's status would "make it necessary" for Amirov to behave a certain way is clearly inadmissible state of mind and motive testimony.  Setting aside the proposed expert's dubious testimony regarding the Thieves' Code,[9] opining that Amirov would have been more likely to choose to follow it

---

[8] The defendant's notice includes academic papers authored by Mr. Gurbanov, and counsel for the defendant has proffered at last two others.  They are all written in Russian.  A review of the papers appears to indicate that none of the papers regards the *vory v zakone*, but instead discuss extremist behavior and terrorism.  These papers do not, therefore, appear to relate to the proposed testimony.

[9] For example, in light of Mr. Gurbanov's proffered testimony that the defendants were members of Guli's Vor, and his opinion that the Thieves' Code prevents *vory* from carrying weapons, it is unclear what the expert makes of the Government's exhibits demonstrating the defendants' use of firearms (such as videos of Omarov firing guns).

because his position *might* have been at risk based on challenges to that position other members of organized crime (who may or may not be purported members of Guli's Vor) were rumored to be attempting is nothing but rank speculation about how Amirov's state of mind.  Even if it were not, it would not be permitting, because the expert cannot supplant the jury's role by testifying about what Amirov would have been thinking in connection with the charged offenses.

*    *    *

Accordingly, Amirov's proposed experts should be precluded from offering opinions about the number of users of WhatsApp and cloud accounts or their locations, details regarding the activities of Guli's Vor, and Amirov's motives.


Respectfully submitted,

MATTHEW PODOLSKY
Acting United States Attorney


by: _____
Jacob H. Gutwillig
Matthew J.C. Hellman
Michael D. Lockard
Assistant United States Attorneys
212-637-2215 / 2278 / 2193


cc: Defense Counsel
    (Via ECF)